THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
CHARLES DAVIS, Appellant.

First Department, March 8, 1983

### APPEARANCES OF COUNSEL

*Judith L. Turnock* of counsel (*William E. Hellerstein,*
attorney), for appellant.

*Allen H. Saperstein* of counsel (*Steven R. Kartagener*
with him on the brief; *Mario Merola, District Attorney,*
attorney), for respondent.

### OPINION OF THE COURT

Ross, J.

Since June 15, 1979 the defendant, who was 28 years old
and who had twice been convicted of violent felonies, was a
fugitive from justice. On May 22, 1979 this court unani-
mously affirmed (70 AD2d 549) defendant's conviction and
sentence concerning another crime unrelated to the in-
stant proceeding. A Bronx jury, in 1978, had convicted him

of robbery in the second degree and after his conviction the Trial Judge sentenced him, as a second felony offender, to an indeterminate term of from 5 to 10 years' imprisonment. Subsequent to that affirmance, when the defendant did not surrender to start serving this sentence, a warrant, dated June 15, 1979, was issued for his arrest.

While a fugitive, defendant changed his residence to an apartment situated in the Marble Hill housing complex located in The Bronx. Also living in that housing complex was Marjorie Marin (Marjorie). Her apartment was located on the ninth floor of 69 West 225th Street.

In September, 1979, Marjorie had been defendant's girlfriend for about two months and had talked of going to Florida with him.

Before defendant appeared on the scene, Marjorie had been romantically involved with John Purig (John) for about two and one-half years, and they had lived together from 1977 to 1978. John became aware that Marjorie was seeing defendant. On the afternoon of September 25, 1979, he went, unannounced, to Marjorie's home, in order to confront her about her relationship with defendant. As he emerged from the elevator, she and the defendant were in the hallway, waiting for the elevator. Thereafter, John, Marjorie and defendant rode down together to the first floor. During the ride down, John and Marjorie exchanged words, while defendant remained silent. John said to Marjorie, in a voice loud enough for defendant to hear, "how * * * [can you] associate with such a person?" Defendant testified that when he heard this remark he "smiled" because he thought it was funny.

After the elevator stopped at the first floor, John and Marjorie continued to talk with each other, while the defendant walked a short distance away. Defendant testified that, as John was leaving, John said to defendant: "What was I doing going out with her" and, defendant's response was: "I laughed at him." John was upset. Then, defendant testified that John said to defendant: "Don't worry, I'll get mine"; and, defendant's response was: "I laughed and I walked off."

At about 8:30 A.M. on September 27, 1979 John drove to Marjorie's home. This trip, like the one on September 25,

1979, was unannounced. He met Marjorie in the hallway of the apartment house and again the subject was Marjorie's relationship to defendant. He testified that during this conversation, in response to Marjorie's statement that defendant would take care of him, he (John) indicated to her that he also had a gun. This conversation terminated and he returned to his car and waited. Marjorie came downstairs and spoke further to John. Marjorie was crying when she left him to return to the apartment. John remained in the car.

When Marjorie entered the apartment, defendant was waiting for her. According to defendant, Marjorie warned defendant: " 'Don't go downstairs,' so I asked her, 'Why not?' and she says, 'Because Johnny is downstairs and he is waiting for you and he has a pistol' * * * I asked her, 'Why is he waiting for me?' and she just says, 'He showed me a pistol and he is threatening to use it on you' * * * 'Well, I told her I will be right back up and I went downstairs.' "

Defendant went downstairs wearing a holster containing a fully loaded pistol. Even though defendant contended that he only began carrying this pistol on his person since he had talked with John two days before, he admitted that he had purchased the gun from someone in the street a couple of weeks before that confrontation. Thus, he acquired possession of this weapon at a time while he was a fugitive and prior to any alleged threat from John.

John contended that defendant walked toward John's car carrying a gun in his hand. Therefore, he testified: "I decided that I should seek assistance" and drove away.

The defendant's version of what happened, as he approached the car, differs from John's. Defendant testified that John rolled down the car window, and stuck out what appeared "to be a pistol". Further, defendant testified that in reaction to John's production of a pistol the defendant put his hand on his own pistol and then, as John drove away, John said: " 'I will be back and I'm going to take care of you.' "

Later that morning, defendant, Marjorie, and Marjorie's five-year-old daughter left the apartment building. When they arrived in the street, defendant looked over his shoul-

der and saw John standing with a group of men. According to defendant this sight panicked him because he believed that John "was making good on his threat" and so defendant ran. However, defendant admitted that neither John nor any of the men that he was with made any threatening move towards him before he ran.

As mentioned *supra,* John testified that he drove away to seek assistance. Between 9:00 and 9:30 A.M. he stopped a New York City Police Department marked radio patrol car occupied by uniformed Sergeant Patrick Dudgeon (Dudgeon) and uniformed Police Officer Dominio, the driver. He told them that the defendant had a gun and took these police officers back to the apartment building where Marjorie lived. Dudgeon testified that, when they arrived at the building, John, Dudgeon and Dominio got out of their respective vehicles and talked in front of that building.

As a result of this conversation, Dudgeon summoned the 52nd Precinct anticrime unit to come to that location. Shortly thereafter an unmarked police car arrived containing four officers, to wit: Sergeant Koswicki, Albert Calisc (Calisc), James Finnegan (Finnegan) and Richard Messemer (Messemer). These anticrime officers exited their car and joined the two uniformed officers and John on the sidewalk. Even though these four anticrime officers were wearing civilian clothes, they each had their police shields displayed on chains hanging around their necks.[1]

While John was talking to these uniformed and nonuniformed police officers, he suddenly exclaimed loudly "that's him" and pointed toward the defendant who was coming out of the building. After John's yell, uniformed Sergeant Dudgeon looked in the direction that John was pointing and: "looked at the * * * [defendant] and * * * [the defendant] began to run". Then Finnegan, wearing his badge around his neck, shouted at defendant " 'Stop, police.' "[2]

Despite it being broad daylight and with uniformed and nonuniformed police officers — who were prominently displaying their shields — being present, the defendant continued to run.

1. This testimony appears at page 39 of the transcript of testimony.
2. This testimony appears at page 396 of the transcript of testimony.

Sergeants Dudgeon and Koswicki, as well as Officers Calisc and Finnegan, pursued defendant through the project buildings, a parking lot and courtyards. In the course of the chase, Dudgeon, Calisc and Finnegan at different times called out[2A] "Halt, police" and "Police, stop"; but the defendant kept on running.

Clifford Aikman (Aikman) and David Millin (Millin), who were employees of the Marble Hill Housing Project, heard the shouts of "halt, police".[3] Then Aikman and Millin saw defendant running and being chased by a police sergeant in uniform and by another officer in civilian clothes with "a chain around his neck which had a badge on it".[3A] Millin testified that defendant ran right by him carrying a gun in his (defendant's hand), which defendant pointed at Millin's face.[3B] In fact, Millin heard the gun that was pointed at him "click".[3B]

Officer Messemer maneuvered the unmarked police car which had its siren on and red lights flashing, so as to corner defendant in an alleyway. Messemer stopped the car and got out. He testified:[4] " 'I entered the alleyway; I ran in about ten feet and I yelled, "Halt, police". He [defendant] was up, I would say maybe 50 feet from me, and he stopped. He had his back to me but he stopped and he turned around when he got sideways to me. I saw a gun in his hand; he turned around, faced me, pointed the gun at me, and pulled the trigger. Instinctively I put my gun up and fired back. He in the same position stayed there and pulled the trigger again and fired the gun at me one more time, and I fired again the second time. At that point, I started to run or back out of the alleyway as fast as I could. There is a * * * step * * * I tripped over that and fell backwards. As I got to the base of the alleyway, Officer Calisc just got on the scene; he saw me fall out of the alleyway, reached down, grabbed me, pulled me out of the way, and took a position on the floor, and also Calisc was right on top of me behind the wall.' "

---

**2A.** This testimony appears at pages 223, 360 of the transcript of testimony.

 **3.** This testimony appears at pages 430 and 450 of the transcript of testimony.

**3A.** This testimony appears at pages 432, 451 of the transcript of testimony.

**3B.** This testimony appears at pages 453-454 of the transcript of testimony.

 **4.** This testimony appears at pages 302-303 of the transcript of testimony.

Calisc testified:[5] " 'I looked up the alley to see where the defendant was located in the alleyway * * * [and] the defendant was located behind a lamp post, holding a gun down and fired at me [Calisc], at which time I returned one shot' ".

Officer Finnegan dropped out of the foot chase and got into the marked radio car, mentioned *supra,* and uniformed Officer Dominio drove him to the alleyway, where the shots were being fired. When they arrived at the alleyway, Finnegan got out. He testified:[6] " 'I looked up the alley behind the pole here. I saw the defendant [in] what we call a combat position,[7] and * * * [he] came up towards me, and I went back down, and he shot at me.' "

Further, Finnegan testified:[8] " 'I crouched back down behind the car, then I looked to my left and there was an elderly senior citizen standing there, so I yelled, get out of the way, get out of the way. He didn't hear me. I had to get from behind the car, grab him [the senior citizen] and throw him aside. I went back to my position behind the fender. I looked up, saw * * * [defendant] laying down, face up.' "

At this point the officers shouted to defendant to put his hands up in the air. Defendant did not comply so this order was repeated. Sergeants Dudgeon and Koswicki and Officer Finnegan walked down the alley to where the defendant was lying.

Sergeant Dudgeon, who was wearing a uniform, had to twice tell defendant "to turn over and lie on his stomach and put his hands behind his back" before defendant did so. Finnegan took possession of defendant's gun,[9] which was a .38 calibre revolver, containing 6 spent shells. The defendant's black leather holster was found "under the left side of his body".

---

5. This testimony appears at page 362 of the transcript of testimony.

6. This testimony appears at page 402 of the transcript of testimony.

7. Finnegan described a combat firing position in his testimony. He said the defendant had his gun in both hands, which were outstretched in front of his body.

8. This testimony appears at pages 404-405 of the transcript of testimony.

9. Police Officer John Tansey (Tansey), assigned to the ballistics section of the New York City Police Department, testified that, after testing this weapon, he concluded that it was an operable firearm.

As defendant was being handcuffed by these officers, he began shouting obscenities. In spite of being surrounded by police officers, who were either wearing uniforms or were wearing prominently displayed shields, defendant made these statements that were part of the *res gestae*.[10]

Calisc testified:[11] " '[H]e [defendant] looked right at me and he said, "I should have killed you when I had the chance," and he turned around and he spit on Sergeant Koswicki's shoes' [Sergeant Koswicki was still wearing his badge on a chain hanging from his neck]."

Finnegan testified:[12] " 'He [defendant] said * * * "I should have killed you." ' "

When defendant was in custody, the officers noticed that he had been wounded.[13] They summoned an ambulance, which defendant walked to by choice, and it took him to North Central Bronx Hospital where his wound was treated.

In substance, the defendant testified that he shot at the officers because he did not know that they were police officers and he denied making the remarks, quoted *supra,* when he was arrested.

The jury found defendant guilty of the crimes of an attempt to commit murder in the second degree upon Officer Messemer; an attempt to commit assault in the first degree upon Officer Calisc; an attempt to commit assault in the first degree upon Officer Finnegan; and criminal possession of a weapon in the second degree.

We do not agree with the dissenters implied assessment that this is a close case. Just because there are conflicting accounts does not mean that the defendant was not convincingly proven guilty.

---

**10.** See *People v Marks* (6 NY2d 67, 71), where the doctrine of *res gestae* is defined as referring to verbal acts, forming part of the transaction itself.

**11.** This testimony appears at page 365 of the transcript of testimony.

**12.** This testimony appears at page 407 of the transcript of testimony.

**13.** Dr. Neil Greenidge (Greenidge) testified that he is a board certified physician in general surgery and that he examined defendant when he arrived at the hospital. Greenidge stated that the "gunshot wound was in the right neck, the entrance was in the front of the right neck with an exit in the back".

"The proof of the defendant's guilt was overwhelmingly established on the record herein." (*People v Mandrachio,* 79 AD2d 278, 279, affd 55 NY2d 906.)

In order to support their contention that this was a close case, the dissenters ignore portions of the record that contain overwhelming objective evidence of defendant's guilt.

To recapitulate. The following evidence appears in the record:

1. Even the defendant admitted in his direct testimony that the chase between himself and the police officers took place in the *daylight* of the morning hours. The significance of daylight is that the evening shadows did not interfere with defendant's vision. The dissenters do not mention the time of day of the incident.

2. Despite the dissenters mentioning that the "defendant had been carrying the gun since the threat by Puig [*sic*] two day [*sic*] earlier"; they ignore the defendant's admission in his testimony that he purchased this gun two weeks before John 'Puig' made any alleged threat to defendant.

3. The dissenters completely ignore the record when they write "the record does not disclose whether these shields [of the civilian clothes officers] were fixed to the officers [*sic*] chests as they galloped through the project in pursuit of the defendant." (KASSAL, J., dissenting opn, p 200.) The disinterested witnesses Aikman and Millin testified that they saw defendant being chased through the project by a police sergeant in uniform and by another officer in civilian clothes with *"a chain around his neck which had a badge on it"* (emphasis added).

4. Throughout the dissent, not a word appears with reference to the defendant's awareness that he was a fugitive at the time of this incident. The dissent completely ignores the fact that defendant was well aware that he was a fugitive who had been sentenced and would be compelled to serve 5 to 10 years, for robbery, if taken into custody by the police.

Not to be overlooked in this recapitulation of the record, is the defendant's vocal outburst of murderous intent ex-

pressed against the police officers, who terminated the instant shooting incident and defendant's fugitive status.

By their verdict the jury rejected the defendant's contention that he mistook these identifiable police officers as assassins out to murder him. The jury heard and observed the defendant and chose to disbelieve him.

The Court of Appeals said in *People v Carter* (37 NY2d 234, 239): "[T]he appearance, attitude and demeanor of a witness upon being questioned and while before the [jury] are matters to be taken into consideration in testing veracity and in determining the weight to be accorded his or her testimony (*Matter of Nowakowski,* 284 App Div 655, 657, affd on rearg 1 AD2d 250, 252, affd 2 NY2d 618). Indeed, the opportunity of observation often affords the most accurate method of ascertaining the truth (*Boyd v Boyd,* 252 NY 422, 429)."

On the basis of this record we must reject our dissenting brothers' conclusion that: "It is patent that the jury experienced difficulty in resolving the factual issue as to intent since the defendant was convicted of attempted murder in the second degree, not in the first degree, as charged in the indictment. This conclusively established the finding by the trier of the facts that appellant [defendant] did not know that his pursuers were police officers." (KASSAL, J., dissenting opn, p 199.)

As we unanimously said in *People v Rivera* (77 AD2d 538, 539): "We cannot speculate why the [fact finder] did not convict defendant-appellant of [attempted murder in the first degree] * * * There was no repugnance in this verdict — inconsistency perhaps, but that is always within the scope of authority of a trier of the fact."

To speculate why the jury voted as it did, is at best, an exercise in futility. However, the Trial Judge, without objection from the defendant, said after trial that only a *single* juror had difficulty in finding defendant guilty of attempted murder in the first degree.[14]

---

14. See sentencing minutes of March 5, 1980, at page 5, where the Trial Judge said, without contradiction: "Now it's the court's recollection from the information that apparently was relayed to counsel in their discussions with the jurors that it is *eleven to one* for conviction with respect to Officer Messemer as a *police officer*" (emphasis added).

Merely because we make appropriate reference to the record, mentioned *supra,* concerning the Trial Judge's comment about the jury's division on the attempted murder one count, the dissenters accuse us of sitting "as the 13th juror" and of intruding "upon the deliberative process of the jury". Such statements by our dissenting brothers completely ignore the record.

Judges and lawyers know that it is not unusual for one juror to sway the other 11 to compromise their conclusions so as to obtain a unanimous verdict. It is the mandate that the verdict be unanimous that makes such compromise a rather common occurrence. To read some legal conclusion into such compromise is truly "boot strapping".

In spite of the overpowering evidence of defendant's guilt, the dissenters would reverse because they contend that: "defendant was deprived of his right to a fair trial by (1) the prosecutorial misconduct in his cross-examination, (2) * * * [his improper] comments in summation as to defendant's silence at the time of arrest and (3) the absence of curative instructions." (KASSAL, J., dissenting opn, p 190.)

We find no merit to these contentions either based upon the facts or the law.

The statement in the dissent that the defendant was silent at the time of the arrest is not supported by the record.

Whether defendant said anything on arrest was a hotly contested issue. On the one hand defendant denied in his testimony that he said anything at his arrest. But, on the other hand, as quoted *supra,* both officers, Calisc and Finnegan, testified that at defendant's arrest he said that *he should* have killed them.

The dissenters rely for their legal authority upon the majority opinion in *People v Conyers* (52 NY2d 454, 457), where it is written: "[W]e * * * hold that, *absent circumstances not here present,* our State rules of evidence preclude the use of a defendant's pretrial silence to impeach his trial testimony" (emphasis added).

The 1981 Survey of New York Law (33 Syracuse L Rev 253, 262) contains the following pertinent comment in the

"Evidence" section about the Court of Appeals decision, cited in *Conyers* (*supra*): "Without describing what those circumstances might be, the majority opinion noted that in the event of 'unusual circumstances'[15] such evidence might be admissible" (footnote added).

Assuming, *arguendo,* that the defendant had remained silent when arrested, then we believe this matter may very well fall into the category of an "unusual circumstance" situation, based upon the fact pattern *supra.* However, unlike the defendant in *Conyers* (*supra*), this defendant did not remain silent on arrest. Thus, *Conyers* is distinguishable.

The Court of Appeals recognized in *People v Savage* (50 NY2d 673, cert den 449 US 1016), that when a defendant voluntarily breaks his silence on arrest, a different situation is presented. In *Savage* the court held (p 676): "The question on this appeal is whether a defendant who * * * having elected to waive his right to silence, proceeds to narrate the essential facts of his involvement in the crime, may be cross-examined about his failure to inform the police at that time of exculpatory circumstances to which he later testifies at trial. We hold that, under the circumstances here, neither due process nor the privilege against self incrimination prohibits this manner of impeachment".

Significantly, the defendant's experienced trial counsel did not object to the following cross-examination of the defendant by the prosecutor:[16]

"Q. Did you say anything to them [the police] about the fact that you thought they were chasing you? That they were going to hurt you?

"A. I did not say anything.

"Q. You didn't say anything to them?

"A. Not a word".

Based upon this analysis, the fact that the prosecutor commented in his summation upon the fact that defendant

---

15. In the majority opinion in *Conyers* (52 NY2d 454, *supra*), the words "unusual circumstances" appear on page 459 in this sentence: "[W]e conclude that the use of such evidence for impeachment purposes cannot be justified in the absence of unusual circumstances".

16. These questions and answers appear at page 630 of the transcript of testimony.

said he did not make any statement at the time of arrest was not error. Since his testimony had been specifically contradicted by the arresting police officers, this raised a question of defendant's credibility. Obviously, fair comment, reflective on a defendant's credibility, was proper and did not require curative instructions from the trial court.

As the Court of Appeals further wrote in *People v Savage* (*supra,* p 679): "Given defendant's voluntarily rendered narrative of his part in the shooting, this omission speaks more eloquently than words. For, what was omitted is far from an inconsequential detail or a collateral matter, but a fact of such overwhelming significance that its absence from the narrative was at least as calculated to distort his recitation as a most affirmative falsehood. It put an entirely different cast on the event. It is an elementary rule of evidence, and of common sense, in our State and almost every other jurisdiction, that, when given circumstances make it most unnatural to omit certain information from a statement, the fact of the omission is itself admissible for purposes of impeachment (3A Wigmore, Evidence [Chadbourn rev ed], § 1042; Richardson, Evidence [10th ed — Prince], § 222). This rule is firmly imbedded in behavioral expectations (cf. *People v Dawson, supra*)."

After his conviction, the defendant was sentenced to the following concurrent terms of imprisonment: As to the crime of attempted murder in the second degree, 12½ to 25 years; as to each crime of attempted assault in the first degree, 3½ to 7 years; and, as to the crime of criminal possession of a weapon in the second degree, 7½ to 15 years. All of these sentences were made to run consecutively to the sentence of 5 to 10 years, which had been imposed on the defendant concerning his 1978 conviction, discussed *supra.*

The Trial Judge at the time of sentence said:[17]

"THE COURT: All right. I think certainly in view of the extensive remarks by both of the attorneys and particularly defense counsel, it is appropriate for the court to make some remarks.

17. See sentencing minutes of March 5, 1980, at pp 22-23.

"Now, clearly, the court does not view the same facts that the defense counsel has seen in the same light. This individual has led a charmed life, a charmed life to the detriment of society. He has eight known arrests during his adult life and he has three felony convictions. He has served minimal time on his record. But for some of the requirements he would stand before this court as a persistent felony offender entitled to be sentenced as an 'A' felon, as you are well aware. And if the facts reported to the court are correct, that there was *one juror standing in the way of him being convicted with knowledge that the man he attempted to kill was a police officer,* he would be standing here facing a sentence as an 'A' felon with a minimum possible of fifteen to life.

"As it presently stands this court cannot conceive of a stronger case for applying the maximum sentence to any individual" (emphasis supplied).

The dissent finds this sentence excessive because of its "consecutive" aspect. My dissenting brother writes: "Given the [character] of the crime and the close factual situation, mitigation seems in order. I would exercise our discretion by reducing the sentence to the extent of making the terms imposed concurrent with the prior sentence." (CARRO, J., dissenting opn, p 202.)

We do not agree. Firstly, we do not find a "close factual situation". Secondly, the test is not whether we agree with the sentencing court, but did that court abuse its discretion. We hold that the trial court did not abuse its discretion. In fact, we find that the sentence is not excessive. To follow the logic of the dissent would in effect eradicate a 5- to 10-year sentence for the robbery of an employee of Bronx Community College, where defendant professed to be a student. This defendant, who has a total of three convictions for violent felonies and was a fugitive at the time that he committed these crimes, is not entitled to such consideration from this court.

Accordingly, the judgment, Supreme Court (McMAHON, J.), Bronx County, rendered March 5, 1980, convicting defendant of the crimes of attempted murder in the second degree, of two counts of attempted assault in the first

degree and criminal possession of a weapon in the second degree, and sentencing him to concurrent terms of imprisonment of 12½ to 25 years on the attempted murder count, 3½ to 7 years on each attempted assault count and 7½ to 15 years on the possession of a weapon count, all sentences to run consecutively to a previously imposed and unserved sentence of 5 to 10 years, should be affirmed.

KASSAL, J. (dissenting). We find ourselves in disagreement with our colleagues, who have concluded that the evidence as to defendant's guilt was overwhelming. The majority fails to address the critical issue that defendant was deprived of his right to a fair trial by (1) the prosecutorial misconduct in his cross-examination, (2) the prosecutor's comments in summation as to defendant's silence at the time of arrest and (3) the absence of curative instructions.

The error is highlighted in this case, since the prime issue was whether defendant possessed the requisite mental state to commit the specific crimes charged. In such instance, as here, where the verdict reflects that the jury did experience difficulty in resolving the issue, the prejudicial effect resulting from the prosecutor's repeated use of defendant's postarrest silence to impeach credibility and to refute the exculpatory account offered at trial warrants a reversal and remand for a new trial under principles of fair play and substantial justice.

Defendant appeals from a judgment which convicted him of attempted murder in the second degree, attempted assault in the first degree (two counts) and criminal possession of a weapon in the second degree. The indictment had charged defendant with three counts of attempted murder in the first degree and criminal possession of a weapon in the second degree.

The incident, which occurred September 27, 1979, took place after an apparent disagreement between appellant and John Puig involving Marjorie Moran, who in the past had an ongoing 2½-year relationship with Puig and a recent one with defendant. As revealed in the prosecution's case, on September 25, 1979, Puig appeared, uninvited, at Ms. Moran's apartment to inquire as to her involvement with defendant. Two days later, Puig returned, again unin-

vited and, during a conversation in the hallway, he told her that he had a gun. Shortly thereafter, Puig, while in his car, observed defendant exit the rear of the building, carrying a plastic bag at waist level, with his hand inside. As Puig drew closer, he noticed defendant remove a revolver from the bag, and, then, Puig sped away to "seek assistance." After encountering a uniformed sergeant and his driver in a marked vehicle, the precinct's anticrime unit was summoned, whereupon four plainclothes officers arrived in an unmarked car at the apartment building. Moments later, while the group stood on the sidewalk, defendant emerged from the rear of the building, accompanied by Ms. Moran and her daughter, at which point Puig shouted "There he is!" The officers, in casual civilian dress, chased after defendant, who began running away from them in a westerly direction.

According to the testimony of the officers, during the chase they announced that they were police officers. Officer Messemer, in an unmarked squad car, observed defendant run into an alley, across Broadway. When Messemer entered the alley, he saw defendant 50 feet ahead of him and, although he directed, "Halt, police", defendant fired shots right at him. After Messemer tripped and fell in the alley, he was pulled away by Officer Calisc, also in casual attire, who, while crouched behind a lamp post, was also fired upon. Defendant, wounded in the exchange with the plainclothes officers, was apprehended and handcuffed.

Defendant, who relied upon a defense of justification, *inter alia,* testified and gave an entirely different account to raise in issue whether or not he possessed the requisite *mens rea* to sustain the charge of attempted murder in the first degree. His defense was that he did not know that the men chasing him were police officers, specifically denying that he heard any of the plainclothes officers give any warning or indication that those chasing him were policemen. Rather, he believed the men had been summoned by Puig to aid in carrying out the latter's threat to kill him.

Defendant claimed that when he initially met Puig in the elevator while he was with Ms. Moran, Puig inquired as to why appellant was going out with Ms. Moran. When defendant responded that it was none of his business, Puig

retorted, "Don't worry, you are going to get yours." Two days later, on September 27, when defendant arrived at Ms. Moran's apartment, she told him that Puig was waiting for him downstairs with a pistol. Defendant went down to meet him, armed with a gun in a hip holster inside his shirt. Defendant had been carrying the gun since the threat by Puig two days earlier. When he encountered Puig, who was sitting in his car, he observed Puig reach into his glove compartment and pull out what appeared to be a gun, whereupon defendant placed his hand on his pistol inside his shirt. Puig left declaring, "I'll be back and I'm going to take care of you." Subsequently, when appellant and Ms. Moran left the building from the rear exit, defendant observed Puig standing with a group of men and, believing that his antagonist intended to carry out his threat, appellant ran in a westerly direction away from the group. chasing after him. He saw no shields or uniforms and denied that any in the group identified himself as a police officer. He also testified that he did not remove the gun from the holster until after two shots had been fired at him.

Thus, the jury was presented with two quite divergent accounts of what had transpired and was confronted with deciding whether defendant possessed the requisite intent to sustain a conviction for the crimes charged, or lesser ones. The disparity in the proof on the crucial issue to be resolved was recognized by the prosecutor in his closing statement to the jury, when he reminded them that one of the key elements to be determined was whether "defendant knew or reasonably should have known that those men were police officers and that in firing at them with this gun he intended to take their lives." With reference to the difficulty in determining Davis' intentions, the prosecutor suggested that the jurors examine "what he did and what he said and what other people did and what they said in determining whether or not he knew they were police officers and whether or not he intended to take their lives." The prosecutor, however, was well aware that appellant claimed he said nothing at the time of his arrest, since, on cross-examination of defendant, he had inquired as follows:

"Q. Did you say anything to them about the fact that you thought they were chasing you? That they were going to hurt you?

"A. I did not say anything.

"Q. You didn't say anything to them?

"A. Not a word."

This testimony as to defendant's silence at the time of his arrest is wholly ignored by the majority, whose selective review of the record has concluded that defendant, as he was being handcuffed, shouted obscenities and declared that he should have killed the officers when he had a chance. Defendant, however, denied that he said anything, "Not a word." Moreover, the reference to the testimony of the officers misperceives the principal consideration before us on this appeal, i.e., the propriety of the comments by the prosecutor in summation as to defendant's silence at the time of his arrest. The critical issue is not the factual determination of whether defendant actually was silent or whether he engaged in a "vocal outburst of murderous intent", as is suggested by the majority.

*People v Savage* (50 NY2d 673), has no bearing upon the specific issue now before us. There, the Court of Appeals considered the propriety of cross-examination of a defendant who, "having been given the warnings required by *Miranda v Arizona*" (p 676) (a significant factor omitted from the quotation in the majority opinion), waived his right to silence by proceeding with a narrative of the facts to the police pertaining to his involvement in the crime, but omitted, at that time, any reference to the exculpatory account later relied upon at trial. In permitting cross-examination upon such omission, the court pointedly distinguished the factual situation in *Savage (supra)* from that in this case. Here, the focus is upon the use of postarrest silence for impeachment purposes and whether such use is violative of due process and the constitutional privilege against self incrimination (see *Doyle v Ohio,* 426 US 610). In *Savage (supra)*, at the time of arrest, defendant admitted having shot the victim during a dispute, but omitted any reference to the "crucial exculpatory circumstance" offered at trial, namely, that the shooting was

unintentional and was precipitated by the victim's attempt to rob defendant. Concluding that the case did not fall within "the analytical mold of *Doyle*", the Court held (50 NY2d, at p 679) "Given defendant's voluntarily rendered narrative of his part in the shooting, this omission speaks more eloquently than words. For, what was omitted is far from an inconsequential detail or a collateral matter, but a fact of such overwhelming significance that its absence from the narrative was at least as calculated to distort his recitation as a most affirmative falsehood. It put an entirely different cast on the event."

In our case, in his summation, the prosecutor pointedly alluded to defendant's failure to speak at the time of his arrest, arguing to the jury: "Now, here's a fellow who wants you to believe that he was protecting his own life, that he thought they were the bad guys out there. They come in, and does he say, 'Oh, my God, it's the police, it's been a big misunderstanding, I though [*sic*] you were Puig's friends, I thout [*sic*] you were there to hurt me, I didn't know you were the police'? He's being handcuffed, put in an ambulance and taken away under police escort and he tells you he said absolutely nothing to the police. When I asked him, 'Did you say anything at all?', he said, 'I didn't say anything to them.' Is that how someone who's been victimized acts? Is that how someone who is the innocent, the innocent victim, is that how he reacts? Wouldn't he have said something more consistent with his position? Would he have really stood there and said nothing while handcuffs are being put on him?"

Defense counsel's objection was sustained, but no curative instructions were given by the court and, completely ignoring the court's ruling shortly before, the prosecutor, nevertheless, continued: "Now he's got absolutely no obligation whatsoever to say anything. He doesn't have to say a word to anybody but you apply your own common sense, your own everyday knowledge."

An objection to the foregoing statement was likewise sustained, but, again, the court made no attempt to give appropriate instructions to ameliorate the prejudicial impact of this second improper reference by the prosecutor to defendant's silence at the time of his arrest. The jury was

never instructed that they were not to take into account defendant's failure to make an exculpatory statement. Following the court's charge, a motion for a mistrial was denied, with the Trial Justice then concluding that any curative instruction at that time would unnecessarily highlight the matter and might result in further prejudice.

It is well established in this State that the silence of a defendant at the time of arrest may not be used against him in a subsequent judicial proceeding. (*People v Rutigliano,* 261 NY 103). Most recently, our Court of Appeals reaffirmed the principle in *People v Conyers* (52 NY2d 454, 459 [*Conyers II*]), holding inadmissible the failure to offer an explanation at the time of arrest, since any reference to silence has a "potential for prejudice [which] outweighs its probative worth". In finding that the summation by the District Attorney as to defendant's failure to speak when confronted by law enforcement officials was improper, the court took cognizance of the fact that an individual's silence could be attributed to any one or more of these considerations: his knowledge that he was under no duty or obligation to speak; an awareness that anything that might be said could be used against him; a belief that any attempt at exoneration would be unavailing; or a fear of or mistrust for the police. Thus, the court concluded that a person's silence at the time of arrest could be dependent upon factors wholly unrelated to guilt or innocence. This exclusionary rule, announced in *Conyers II* (*supra,* p 460) as observed by Judge GABRIELLI: "represents a simple recognition of our judicial responsibility to formulate rules of evidence to protect the integrity of the truth-finding process. Evidence that is highly prejudicial but of low probative worth has traditionally been excluded from criminal trials because it carries with it a grave potential for distorting the search for truth which is at the heart of our adversary system. As the Supreme Court has succinctly observed: 'When the risk of confusion is so great as to upset the balance of advantage, the evidence goes out' (*Shepard v United States,* 290 US 96, 104, quoted in *United States v Hale,* 422 US 171, 180, *supra*)."

The court in *Conyers II* thus affirmed our order (65 AD2d 437), wherein we found that the cross-examination and

summation by the prosecutor improperly violated the defendant's right to remain silent, concluding that the inquiry had a significantly prejudicial effect so as to deprive defendant of his right to a fair trial. The position of the majority here to the contrary unduly penalizes a defendant for exercising his right to remain silent while under police custody which result is in clear derogation of the very rights and warnings to be issued at the time of arrest (*Miranda v Arizona*, 384 US 436, 468). Upon this basis, we agreed in *Conyers* (*supra*) that the error was highly prejudicial, was so fundamentally unfair as to constitute a denial of due process, and did not amount to harmless error (see *Chapman v California*, 386 US 18; *People v Crimmins*, 36 NY2d 230).

Our disposition in *Conyers* (*supra*) was affirmed by the Court of Appeals in *Conyers I* (49 NY2d 174). The court there found significant the constitutional derivation of the implied promise contained in the *Miranda* warnings that a defendant's silence would not be used against him, as flowing from the privilege against self incrimination contained in both the Federal and State Constitutions (US Const, 5th Amdt; NY Const, art I, § 6). In *Conyers I,* the court imposed upon the State an "implied promise" that the exercise of the right to remain silent would not be used for purposes of impeachment, consistent with principles of fundamental fairness and due process. Rejecting the argument that the reference to defendant's silence for purposes of impeachment was harmless error, the Court of Appeals took into account that there was involved a crucial issue of credibility which bore directly upon the guilt or innocence of the defendant (49 NY2d, at p 183): "The jury was presented with a pointed issue of credibility and was required to believe either the defendants or prosecution witnesses. In this context, any evidence tending to impeach Conyers' credibility was extremely significant and may well have had a considerable influence upon the jury. Hence, even were we to find harmless error analysis to be appropriate in a case of this nature, *in the absence of curative instructions* we must conclude that in this case there is a reasonable possibility that this constitutional

error contributed to defendant's conviction (see *People v Crimmins,* 36 NY2d 230, 240-241)." (emphasis added.)

Subsequent to the constitutional pronouncement in *Conyers I (supra),* while a petition for certiorari was pending, the Supreme Court of the United States decided *Jenkins v Anderson* (447 US 231), holding that the use of a defendant's silence for purposes of impeachment did not conflict with Federal constitutional guarantees. The court, nevertheless, preserved the right of local jurisdictions to determine whether, under State evidentiary rules, the use of prearrest silence to impeach credibility should be excluded. Since *Conyers I* was in part premised upon Federal constitutional principles, the Supreme Court granted certiorari and remanded *Conyers* to the Court of Appeals for further consideration in light of the decision in *Jenkins (New York v Conyers,* 449 US 809). Upon remand, the Court of Appeals in *Conyers II* (52 NY2d 454, *supra*) adhered to its prior ruling, announcing that New York's evidentiary rules precluded the use of one's silence for purposes of impeachment, finding it unnecessary to pass upon whether such use of a defendant's postarrest silence would violate the due process clause of the State Constitution (NY Const, art I, § 6), albeit the issue had already partially been addressed in *Conyers I* (49 NY2d 174, *supra*).

The position assumed by the majority here erodes the import of the Court of Appeals opinions in both *Conyers I* and *Conyers II.* In our case, the majority's conclusion condones the jury's evaluating the defendant's credibility on the basis of highly prejudicial matter, which the Court of Appeals has found to have low probative worth. Further, the disposition by the majority improperly subjects the appellant to the prejudicial consequences of having exercised his constitutional right to remain silent in accordance with the *Miranda* warnings given him.

It is clear that the District Attorney, on summation, could properly refer to the testimony of the prosecution's witnesses to the effect that statements were allegedly made by the appellant and, indeed, the contents thereof, as well as the appellant's testimony that he remained silent. This would be fair comment on the issue of credibility. However, upon proceeding beyond that, when the prosecu-

tor commented upon his silence as a basis for an inference of guilt, this comment transcended well-established constitutional principles.

The prosecutor was well aware that the prime issue was defendant's state of mind in terms of whether he knew or should have known that the men chasing him were police officers. Since the issue of credibility was significant, the improper reference in summation and in the prior cross-examination to defendant's postarrest silence undoubtedly had a profound effect upon the jury's evaluation of defendant's veracity. As it did in *Conyers,* the reference to defendant's silence creates in this case the same potential for distorting the search for truth alluded to by the Court of Appeals in *Conyers II* (*supra,* p 460). As we had observed on the appeal in *Conyers* (65 AD2d, at p 440) "in a case where resolution of the issue may well have depended upon the jury's evaluation of defendant's credibility as opposed to that of the chief prosecution witness, the inquiry relating to [defendant's] postarrest silence may have had such a significant prejudicial effect as to deprive him of his right to a fair trial."

We do not subscribe to the majority's assessment of the evidence as so overwhelming to excuse the errors as harmless beyond a reasonable doubt. The transcript reflects two divergent accounts of the events which precipitated the chase and the exchange of shots between defendant and the police. Thus, the trial posed a critical issue as to defendant's state of mind at the time of the shooting, the resolution of which had a direct bearing upon the crime charged — attempted murder in the first degree.

Under the circumstances, with the jury being confronted with two conflicting accounts, the reference in summation to the fact that defendant remained silent at the time he was placed under arrest was clearly improper. This served to improperly highlight the disparity in the evidence and created an unfavorable inference solely because defendant exercised his fundamental right to remain silent.

It is significant that the Trial Justice did not correct the error when committed but, instead, deferred the request by defense counsel to make a record until after the charge. The absence of prompt curative instructions further high-

lighted the impropriety of the injection into the case of this highly prejudicial fact that defendant did not offer at the time of his arrest the exculpatory account relied upon at trial. Moreover, when the objection to the improper statement was sustained, the prosecutor failed to heed the Trial Justice's warning to desist, but continued, suggesting that although the defendant had no obligation to speak, the jurors should apply their own common sense and knowledge in their deliberations, thus returning to the same basic theme and effectively negating the ruling just given.

It is patent that the jury experienced difficulty in resolving the factual issue as to intent since the defendant was convicted of attempted murder in the second degree, not in the first degree, as charged in the indictment. This conclusively established the finding by the trier of the facts that appellant did not know that his pursuers were police officers. Thus, the verdict discredits the majority's observation that "the jury rejected the defendant's contention that he mistook these identifiable police officers as assassins out to murder him." To the contrary, the jury did not "disbelieve" defendant, having specifically acquitted appellant of attempted murder in the first degree. The jury verdict crystalizes that the jury was not convinced beyond a reasonable doubt that defendant knew his pursuers were police officers. It is, therefore, sheer speculation and palpably improper for the majority to conclude otherwise. As an appellate court, we are not empowered to sit in judgment as the 13th juror, as the majority purports to do here.

We do not believe that the record, taken as a whole fairly supports the view taken by the majority opinion. To illustrate, in referring to the exchange between Puig and defendant on September 25, 1979, the majority refers to the cross-examination of defendant that he "laughed" or "smiled" in response to Puig's inquiry as to defendant's "going out with" Ms. Moran. Ignored, however, is defendant's direct testimony that, in reply, "I asked him what business it was of his," following which Puig admonished, "Don't worry, you are going to get yours." It was only after the "threat" that defendant "laughed and * * * walked off."

In a similar vein, the description of the chase through the project omits reference to the conceded fact that the

uniformed Sergeant Dudgeon, whose marked patrol car had been parked east of the building in which Ms. Moran lived and out of sight of her window, did not directly pursue defendant with the plainclothes officers but instead, ran in a different direction, into the parking lot. He did not arrive at the scene until after the exchange of gunfire, at which time defendant was already in custody, lying on the ground.

As observed, defendant testified that he was unaware that his pursuers were police officers. He and Ms. Moran exited the rear of the building, clearly demonstrating an intention to avoid a confrontation with Puig. He observed no uniformed officer, saw no shield and heard no one call to him, "Halt, police." Although the plainclothes officers allegedly "conspicuously displayed their shields on chains around their necks", as alluded to by the majority, the record does not disclose whether these shields were fixed to the officers' chests as they galloped through the project in pursuit of the defendant. This evidence, in any event, only has bearing upon defendant's knowledge that he was being chased by police officers, an issue fully resolved by the acquittal of attempted murder in the first degree.

We also find somewhat disconcerting the speculation by the majority concerning the jury deliberations since the invasion of the secrecy of the jury process is improper. It appears only from the sentencing minutes that, after the verdict, counsel had apparently discussed the case with individual jurors and thereby reported that, at some point, the jury was at an 11 to 1 vote to convict for the crime of attempted murder in the first degree. From this, the majority extrapolates that the dissenter swayed the remaining jurors so that the verdict was a compromise. Is it not equally logical that, after this vote, the jury continued, had further deliberations, carefully reconsidered all of the evidence and that the jurors properly exercised their oath in rendering their verdict? The intrusion upon the deliberative process of the jury in this manner, insofar as it proves to be the basis for judicial action, at the trial or on appellate level, is improper.

We conclude that the improper summation and cross-examination with respect to defendant's silence at the time

of his arrest was unfairly prejudicial by injecting irrelevant and prejudicial evidence, albeit for purposes of impeachment. Clearly, this prejudice to the defendant and confusion to the jury, in regard to his silence, far outweighs the low probative value of this proof. This is especially so here, where the trier of the facts was faced with an evaluation of appellant's credibility in clear contrast to that of the prosecution witnesses. The references to defendant's silence may have had a significantly prejudicial effect on a critical issue, depriving defendant of his right to a fair trial. Similarly, the highly prejudicial conduct of the prosecutor in persisting in these tactics, after objection, without appropriate curative instructions by the court, did not lend itself to a trial by an objective and unbiased jury with full constitutional safeguards. This warrants a reversal and remand for a trial.

Accordingly, the judgment, Supreme Court, Bronx County (McMahon, J.), rendered March 5, 1980, convicting defendant on a jury verdict of attempted murder in the second degree, attempted assault in the first degree (two counts) and criminal possession of a weapon in the second degree, should be reversed, on the law, and the matter remanded for a new trial.

Carro, J. (dissenting). I join Justice Kassal in his dissent, only writing to stress our reproach for the trial court's imputation of significance to the jury's partial deliberations. Since none of the jurors in any way indicated that either their "guilty" verdict on the second degree attempt or their "not guilty" verdict on the first degree attempt charge was accompanied by "reasonable doubt" (*People v Garvin,* 90 AD2d 682), the court was without power to go behind the verdicts and impeach the acquittal for purposes of sentencing.

In addition, I believe that the sentence imposed was excessive. The jury acquitted defendant-appellant of attempted murder in the first degree under the first count of the indictment, which charged that he "attempted to cause the death of said Richard Messemer, a Police Officer in the course of performing his official duties and known to be a Police Officer by the said defendant, by shooting at him with a pistol" and convicted him instead of attempted

murder in the second degree. Thereby the jury indicated its resolution in favor of the defendant of the factual issue of whether he knew the men who were chasing him and exchanging shots with him were police officers. The majority places great emphasis upon the June 15, 1979 warrant issued for defendant, characterizing him as "a fugitive from justice". What is not mentioned is the stay of execution of sentence, in effect up until this court affirmed the prior conviction, and defendant's testimony that he had not been informed of the affirmance, the June 15 appearance date or the warrant. Thus, while Davis was indeed a "wanted man", he did not have the requisite awareness of his status to be "a fugitive from justice". And if he did not realize they were the police but fled in fear, believing them to be friends of Puig out to do him in, a different perspective is gained from the point of view of sentencing. There is no evidence of premeditated calculation or cruelty of the type which would ordinarily call for a maximum sentence. Further, the only person injured was defendant, who was taken to the hospital in critical condition from a bullet which entered his upper back and exited through the right side of his neck.

Davis has substantial prior criminal involvement. This is his third felony conviction. Moreover, the exercise of the sentencing court's discretion is normally entitled to great weight. However, defendant was not only sentenced to the maximum term of 12½ to 25 years under this conviction, but the sentence was made consecutive to a prior outstanding sentence of 5 to 10 years, making it as effective as a minimum term of 17½ years for parole purposes.

Given the circumstances of the crime and the close factual situation, mitigation seems in order. I would exercise our discretion by reducing the sentence to the extent of making the terms imposed concurrent with the prior sentence.

KUPFERMAN, J. P., and BLOOM, J., concur with ROSS, J.; CARRO and KASSAL, JJ., dissent in separate opinions.

Judgment, Supreme Court, Bronx County, rendered on March 5, 1980, affirmed.