THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v SAMUEL PAGAN, Appellant.

First Department, July 12, 1990

### APPEARANCES OF COUNSEL

*Lawrence B. LaRaus* of counsel *(Peter D. Coddington* with him on the brief; *Robert T. Johnson, District Attorney,* attorney), for respondent.

*Manuel Nelson Zapata* for appellant.

### OPINION OF THE COURT

Per Curiam.

The issue on this appeal is whether the evidence in this largely circumstantial case is sufficient to sustain defendant's conviction of manslaughter in the first degree.

■ Contrary to the position of the defendant, we find that this case is not based wholly on circumstantial evidence. The

defendant's statements in the ambulance could be interpreted by the jury as an admission of guilt, thereby distinguishing this case from one based only on circumstantial evidence and rendering inapplicable the usual standards which apply in exclusively circumstantial cases *(People v Rumble,* 45 NY2d 879). Accordingly, the standard which obtains here is whether after viewing the evidence in the light most favorable to the People, a rational finder of fact could find each of the essential elements of the crime beyond a reasonable doubt. *(See, e.g., People v Contes,* 60 NY2d 620.) Moreover, we conclude that the evidence here is sufficient even if the case is viewed as one based exclusively upon circumstantial evidence which requires that "for guilt to be proven beyond a reasonable doubt the hypothesis of guilt should flow naturally from the facts proved, and be consistent with them; and the facts proved must exclude 'to a moral certainty' every reasonable hypothesis of innocence" *(People v Benzinger,* 36 NY2d 29, 32). Under this standard, too, the facts must be viewed most favorably to the People and it should be assumed that the jury credited the prosecution witnesses and gave the prosecution's evidence the full weight that might reasonably be accorded it. *(People v Benzinger, supra.)*

The evidence presented at the trial established that on July 13, 1986, defendant and his wife, Sylvia Ocasio, spent the evening at a bar on 138th Street, in The Bronx, from 9:30 P.M. until approximately 12:30 A.M. on July 14th. While they both drank heavily during their stay in the bar, the husband was described by the bar attendant as in complete control of his actions, while the wife was characterized as "very drunk" and "staggering" by the time they were ready to leave. It was noted that on the way out of the bar Ms. Ocasio fell to the floor twice and had to be helped to her feet. The couple then took a taxicab to their residence at 582 Southern Boulevard. According to the defendant's testimony, after he and his wife exited the car and separately proceeded towards their apartment building, his wife fell to the ground three times. While he helped her to her feet after one of the falls, he noticed no injury to her head nor did she complain of any injury. Defendant's testimony was equivocal as to whether or not he saw garbage or debris scattered on the sidewalk in front of their building at that time. After the couple entered the building through the vestibule, Ms. Ocasio, without any assistance, proceeded to walk through the hallway and up the four flights of stairs to their third-floor apartment. Upon entering their

apartment, defendant locked the door from inside and he stated that he then left his wife in the bedroom undressing while he went to the kitchen to prepare some food. Defendant stated that his wife had not eaten during the many hours they had spent at the bar nor had he seen her eat during their earlier late afternoon into evening visit to her grandmother's home.

A neighbor, Mayra Rivera, who lived in the apartment directly above that occupied by defendant and Ms. Ocasio, was awakened in the early morning hours of July 14th by the sounds of an argument between a man and a woman, emanating from the apartment below. While she heard the woman speaking, she "didn't hear exactly her words". She did, however, hear the man repeatedly say in Spanish, "Sylvia why did you do this to me"? She then heard a loud noise, which she described as "like if something fell or somebody got hit or pushed, like when you hit a wall or something like that". Following this noise, the witness "heard the man saying, 'Sylvia, wake up, wake up Sylvia', and then everything stopped and then [she] heard footsteps going out of the apartment and footsteps coming back in".

Defendant's own testimony, while differing in specifics, established, without any doubt, that Ms. Rivera's testimony related to sounds coming from his apartment. According to defendant, he was entering the bedroom from the kitchen, carrying a bowl of yellow rice and vegetables which he had prepared, when he found his wife lying on the floor unconscious, bleeding from a head wound. Defendant testified that he dropped or threw the plate of food against the wall and ran to his wife's side trying to make her talk to him. When she didn't respond, he "started yelling, 'Why did you do this to me, Honey?'" and then tried to wipe the blood off her face with a wet cloth. It is uncontradicted that at this point defendant left the apartment to seek help, and, with the aid of an unidentified neighbor who had hailed an ambulance, carried his wife down to the street on a chair. EMS technicians placed the victim in the ambulance and rushed her to Lincoln Hospital. An EMS technician testified that en route, the defendant "was holding her hand" and "telling her to wake up", repeating twice that "he was sorry, that he didn't mean it, and that he loved her".

The wife was found to have a small puncture wound of the scalp and skull with lacerations of the brain with consequent

hemorrhaging. She never regained consciousness and was pronounced dead at the hospital several hours later.

Testimony was also given by Police Officer Joseph who was immediately assigned to the case and first visited the scene at 9:20 A.M. on July 14, 1986, a few hours after Ms. Ocasio had been taken to the hospital. At that time the officer had information, from the hospital, later found to be incorrect, that Ms. Ocasio was suffering from a gunshot wound in the head. Officer Joseph testified that when he entered the vestibule of the building he saw no blood either there or in the hallway or anywhere on the four flights of steps leading to defendant's apartment. He also stated that the screen in the single window in the bedroom was closed. Police Officer Martino who arrived at the premises about 2½ hours later—i.e., 11:45 A.M. on July 14—testified that before entering defendant's apartment, he inspected the sidewalk in front of the building as well as the vestibule, inside hallways and stairs for any signs of blood and found none. He further stated that while he was in the apartment, defendant opened the closet door at which time Martino observed the presence of two metal toolboxes, one of which was partially opened, and paint cans, located in the closet. He also observed an overturned bowl of food and a spoon lying in dried blood on the bedroom floor. An electric drill was also observed in the apartment. A few days later, when it was found that Ms. Ocasio's death was caused by a puncture wound rather than a gunshot, Officer Martino returned with a search warrant at which time neither the drill nor the toolboxes were present in the apartment. While the drill was ultimately produced, and found not to be involved in the incident, the toolboxes and paint cans were never available for examination. While defendant's witnesses stated that there were never toolboxes in the closet but only boxes for the deceased's sewing machine and a plastic drawer where she kept tools and parts of the sewing machine, it is uncontradicted that all such items were gone from the closet, 3 or 4 days later when Officer Martino returned with a search warrant.

The medical testimony in the case was, of course, critical. The People's expert, Dr. Leiderman, a forensic pathologist and a Deputy Chief Medical Examiner of the City of New York who had performed over 2,500 prior autopsies, testified that the 5-foot 1-inch, 125-pound victim's death was caused by a penetrating puncture wound of the scalp and skull with a piece of the skull being pushed into the brain causing a one-

half-inch-deep rupture of the brain substance, with resultant subdural and intraventricular bleeding. Paint chips were also found in the wound. The doctor opined that the puncture was caused by a blow to the head with some instrument or object, of small diameter, that had been applied with considerable force and velocity. She further stated that a hand could have provided the necessary force on the instrument. The doctor emphasized that the fracture was of the depressed type, in distinction to a linear fracture. She explained that a depressed facture usually occurs when a blow is delivered to the head with such severe force that fragments of the bone depress and go into the brain and is much more serious than a linear fracture which is usually suffered as a result of a fall. She testified that decedent's injury was not consistent with a sidewalk fall because a fall while walking on the sidewalk, even if nails had been present there, could not have resulted in such a penetrating injury. Most compelling was Dr. Leiderman's testimony that the nature of the wound was such that it would have rendered the victim immediately unconscious and that the victim could not have sustained that injury on the sidewalk and thereafter traversed, under her own power, through the building's hallways and up the several flights of stairs to the third-floor apartment. The doctor also testified that food, including rice, had been ingested by the decedent a short time before she suffered the injury which rendered her unconscious.

The defendant's expert, Dr. Schwartz, a specialist in internal medicine, acknowledged that he was not a pathologist, that he had performed only 6 or 7 autopsies some 25 years earlier in the course of his training and that "How a person has become expired is not in the area of my medical specialty." Nevertheless, he had no difficulty in pinpointing the precise cause of death as a nail protruding from a board on the sidewalk upon which Ms. Ocasio fell and hit her head. While he stated that unconsciousness would not be immediate and that decedent could have remained conscious for up to 15 minutes after the occurrence and walked up the stairs to the apartment before losing consciousness, his opinion was severely undermined on cross-examination when the authorities he appeared to rely upon where demonstrated not to have involved comparable depressed fracture injuries. Moreover, he acknowledged several times on cross-examination that the nature of the injury was such that there had to have been some external bleeding immediately upon the occurrence of

the injury—that is, some blood would have been present at the location where penetration took place.

Pictorial exhibits showed a dried pool of blood on the apartment bedroom floor as well as blood splatters appearing on the wall and end table in that room.

The foregoing evidence, when taken in the light most favorable to the People, is more than sufficient to find defendant guilty of manslaughter in the first degree whether viewed under the usual standard of review or under the more rigorous standard applicable to an exclusively circumstantial case.

■ Acceptance of the testimony of the People's medical expert that the wound suffered would have caused immediate unconsciousness and made it impossible for the decedent to thereafter continue into the building and up the stairs to the apartment, renders infirm beyond a reasonable doubt defendant's suggested theory that decedent sustained the fatal injury in the course of one of her falls on the sidewalk where there must have been a board with a protruding nail. Indeed, the implausibility of this theory is bolstered both by the testimony of defendant's medical expert, who unequivocally acknowledged that some external bleeding would necessarily have had to occur at the time when, and the place where, the injury occurred, as well as by defendant's own testimony that he saw no bleeding from, or injury to, his wife's head after her falls to the sidewalk. Moreover, the police testimony affirmatively established that there were no bloodstains either on the sidewalk or in the public hallways of the building, or anywhere in the apartment except the bedroom. There can be only one reasonable inference drawn from the foregoing evidence, that the injury which caused Ms. Ocasio's death was not sustained either on the sidewalk or elsewhere outside of the apartment where she and defendant lived, but took place in the bedroom of the apartment, with no one else present.

That some other possible external cause may have been involved, once they were in the locked apartment, was completely eliminated by the testimony of both defendant and the police that the bedroom window was closed, with the screen in place, and that there were no nails or other objects protruding from the floor or walls of that room. Acceptance by the jury of the testimony of the upstairs neighbor, Ms. Rivera, would establish beyond any reasonable doubt that Ms. Ocasio was alive when defendant entered the bedroom, that a quarrel took place between them and that after sounds of "a loud

noise like something fell or somebody got hit or pushed", the defendant said, "Sylvia, wake up, wake up Sylvia". This testimony in conjunction with the medical testimony that bleeding and unconsciousness would immediately follow the infliction of the injury, the physical evidence of bloodstains, and the evidence of the type of force necessary to inflict the injury, all render compelling a single inference, that the fatal injury was inflicted when Ms. Rivera heard the "loud noise" and that defendant was the only person who could have done so.

Defendant's testimony that his wife was already unconscious on the floor when he entered the bedroom to bring her food was impaired not only by Ms. Rivera's version of what she heard but by the physical position of the neatly overturned plate of food which defendant claimed to have thrown against the wall and by the fact that the autopsy of decedent's stomach showed that she had already ingested some of the food before she was rendered unconscious by the injury. By falsely stating that he had been in the kitchen and was first bringing food to the decedent when he found her on the floor bleeding and unconscious, defendant was seeking to demonstrate that he was not in the bedroom at the time when Ms. Ocasio inexplicably was rendered unconscious and bleeding. The falsity of that testimony indicates a consciousness of guilt which under the circumstances of this case could certainly be accorded some degree of probative force as evidence inconsistent with any reasonable hypothesis of innocence. *(See, People v Benzinger,* 36 NY2d 29, *supra; People v Johnson,* 61 NY2d 932.)*

█ The only natural and reasonable conclusion which can be drawn from the evidence in this case is that the 5-foot 8-inch tall, 160-pound defendant, in full control of his faculties, and concededly the only other person present in the apartment, inflicted the injury upon his extremely inebriated, and physically smaller, wife. Under the evidence here, there is no other reasonable explanation for Ms. Ocasio's death.

In that factual setting, the defendant's words in the ambulance "I didn't mean it", could clearly be interpreted as an admission of guilt. *(See, People v Rumble,* 45 NY2d 879, *supra.)*

█ While the instrument which inflicted the injury (and from which, according to both Drs. Leiderman and Schwartz, the paint chips came) was never recovered, the evidence clearly demonstrates that defendant had ample opportunity to

dispose of that instrument before suspicion was directed toward him. The initial misdiagnosis at the hospital, attributing the wound to a gunshot, diverted the investigatory focus during the first critical day after the incident. The evidence established, however, that there were toolboxes, tools and paint cans in the bedroom closet on the morning of July 14th, the day of the incident. While defendant's niece and sister characterized the boxes as sewing boxes where decedent kept her sewing machine, sewing notions and tools, rather than toolboxes, their testimony confirmed that such boxes and tools, however characterized, were kept in the bedroom closet and were there on the day decedent suffered her injury. Three days later, on July 17th, when the police returned with a search warrant, the boxes and cans were no longer present in the closet or elsewhere in the apartment. Defendant alone was in control of the apartment and its contents during this intervening period and was free to dispose of any tools or other incriminating instruments. While the absence of those boxes could be capable of an innocent explanation, their unexplained disappearance so soon after the fatal incident— indeed, only a day or so after the funeral at which defendant appeared so grief stricken—gives little support to a hypothesis of innocence. The inability to locate the precise weapon, however, in no way diminishes the only inference which can reasonably and inescapably be drawn from the facts herein, that the death of Ms. Ocasio in the bedroom was brought about by the only other occupant of the locked apartment, her husband, and his conviction should be affirmed.

■ While we are mindful of the extreme seriousness of the crime of which defendant stands convicted, a review of his record indicates that this crime, which is the first felony conviction for this now 44-year-old defendant, appears to have been an aberrational unpremeditated act inconsistent with his essentially stable and law-abiding past existence. Since there does not appear to be a likelihood that defendant will pose a threat in the future, and in light of his history of productive employment and close and supportive family ties, we find the sentence imposed by the trial court to be unduly harsh. We conclude that a sentence of 3 to 9 years would be more appropriate under the circumstances herein.

Accordingly, the judgment, Supreme Court, Bronx County (Lawrence Bernstein, J.), rendered October 28, 1987, which convicted defendant, after jury trial, of manslaughter in the first degree and sentenced him to a 6⅔-to-20-year prison term,

should be modified, as a matter of discretion in the interest of justice, to reduce the sentence to a prison term of 3 to 9 years, and otherwise affirmed.

MILONAS, J. (dissenting in part). "Generally, a determination as to what constitutes an appropriate sentence is a matter resting within the sound discretion of the trial court and the sentence imposed by that court should not be reduced on appeal unless there was a clear abuse of discretion" *(People v Junco,* 43 AD2d 266, 268, *affd* 35 NY2d 419, *cert denied* 421 US 951). The standard to be applied on appellate review is not whether we agree with the sentencing court but whether that court abused its discretion *(People v Davis,* 92 AD2d 177, *affd* 61 NY2d 202).

Defendant herein was sentenced to a 6⅔-to-20-year term of imprisonment on his conviction for manslaughter in the first degree, a class B violent felony, for which he could have been sentenced to a maximum indeterminate term of from 8⅓ to 25 years' imprisonment (Penal Law § 70.02 [1] [a]; [3] [a]). In that regard, the evidence at trial established that, for some yet unexplained reason, defendant took an unknown instrument and drove it into the deceased's skull, penetrating her brain. The only reason offered by the defendant for his conduct appears in his brief to this court in which he assumes, arguendo, that he killed the deceased and states, "that this tragic event must have been an accident resulting from human passions blurred and excited by stuperous intoxication in a setting of cultural twilight". Nowhere in these extensive proceedings, consuming close to 1,000 pages of minutes, is there a meaningful explanation in mitigation, or reason for leniency, or plea for forgiveness, for this terrible act. The nature of the deed alone speaks clearly of the defendant's violent personality. The fact that a life was taken by a willful and violent crime, of which the defendant was convicted after a trial by jury, cannot be minimized and certainly was no accident. I see no "clear abuse" of discretion by the sentencing court and would affirm the sentence imposed.

MURPHY, P. J., ELLERIN, WALLACH and RUBIN, JJ., concur; MILONAS, J., dissents in part in a separate opinion.

Judgment, Supreme Court, Bronx County, rendered on or about October 28, 1987, modified, as a matter of discretion in the interest of justice, to reduce the sentence to a prison term of 3 to 9 years, and otherwise affirmed.