■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RAYMOND COLLINS, Appellant

Defendant was charged with shooting Charles Cooper in the early hours of May 27, 1984, in front of the apartment building at 1761 Third Avenue in Manhattan. During a birthday party for Cooper's three-year-old son, Cooper and defendant got into a heated discussion. They were asked to "take it outside" if they wished to continue the argument. Defendant

took his jacket and left while Cooper remained at the apartment. Later, Lynette Bullard, the mother of Cooper's son and two of defendant's children, accompanied Cooper to an all-night grocery where Cooper purchased beer and cigarettes. What happened when they returned to the apartment building was the subject of conflicting testimony. According to Cooper, defendant appeared and drew a revolver from his waistband. Cooper covered his face and head with his arms as defendant shot him, first in the left arm and then in the right. As Cooper tried to crawl under a parked car, defendant shot him four more times.

At trial, Lynette Bullard testified that Cooper had been shot by an unidentified male as they returned from the grocery. Defendant, who had no prior criminal record, took the stand. His testimony on direct examination was very brief: he stated that he left the birthday party shortly before midnight and that he did not shoot Charles Cooper.

On cross-examination, defendant testified that he learned of the shooting several days after it happened when Lynette Bullard telephoned him at work. She said Cooper had told detectives that defendant had shot him, that the police wanted to speak with defendant and if he did not go in to talk to them they would consider him armed and dangerous. Defendant telephoned the detective in charge of the case, James Rogers. An appointment with defendant was scheduled for a few days later because the detective was off duty in the interim. Defendant met with Detective Rogers at the 23rd Precinct on June 7th and, following that interview, he was placed under arrest.

In response to the prosecutor's repeated questions about the substance of this prearrest interview, defendant stated that he told the detective that after he left the party he discovered he did not have his house keys. Defendant, who lived with his mother, telephoned his mother who was staying with a family friend in Manhattan to tell her that he forgot his keys. He was invited to spend the night with his mother and her friend, which he did.

The prosecutor challenged defendant's assertion that he told the detective the details of his side of the story. Defendant was asked when he first met his attorney. Defendant replied that he spoke with counsel after he made the appointment with Detective Rogers. He denied that he had arranged for an attorney to represent him before he went to the 23rd Precinct, stating that his mother had retained counsel while defendant was under arrest. Defendant was then asked: "Isn't it a fact

that when you got to the 23rd Precinct you had been told by [your attorney] not to say anything to the police?" Defendant denied this as well as the assertion that he had not said anything to Detective Rogers. Defense counsel did not object to these questions.

The prosecutor returned to the subject, again asking defendant when he spoke with his lawyer and whether the attorney had counseled defendant not to answer any of the detective's questions. Defendant was asked whether or not he had paid counsel any money prior to his interview with Detective Rogers. There was no objection to the question and defendant answered in the negative. On summation, the prosecutor referred to defendant's testimony, arguing: "He didn't speak with Lynette or his mother or Mary about the details that night, just went out and retained [counsel] before speaking with a detective. It's pretty cautious behavior without anything to hide." The court sustained defense counsel's objection and ordered the comment stricken from the record. The jurors were later instructed in the court's charge to disregard testimony which had been stricken from the record.

Defendant now contends that the prosecutor's questions regarding exercise of his Sixth Amendment right to counsel were improper and so prejudicial that they deprived him of a fair trial. We agree. Although the issue was not preserved, by timely objection, as a question of law for our review we, nevertheless, reach the issue as a matter of discretion in the interest of justice. (CPL 470.15 [6] [a].)

The right to counsel, guaranteed by the Sixth Amendment, like the Fifth Amendment privilege against self-incrimination, is fundamental to our adversary system of criminal justice. The right to counsel may "indelibly attach" even before commencement of formal adversary proceedings, and it may extend even to one subject to noncustodial interrogations *(People v Skinner,* 52 NY2d 24, 28-31 [1980]; *People v Kazmarick,* 52 NY2d 322, 327 [1981]). The rules securing this right, once it has attached, proceed from "the belief that an attorney's presence is the most effective means of minimizing the disadvantage of the accused person in custody, and the recognition that an unrepresented defendant in custody who has requested an attorney has indicated his own belief that without legal advice he is not competent to deal with those in whose custody he is being held" *(People v Kazmarick, supra,* at 327).

One who knows that he is wanted for questioning by the

police is not unwise to recognize the need for legal counsel even though he is innocent of any wrongdoing. In such a situation, a prudent person, free of guilty knowledge or fear, might want to ascertain what his rights and duties are. Like the individual who refrains from speaking when confronted by law enforcement officials, the individual who seeks advice of counsel may do so because of a mistrust of those officials or "the natural caution that arises from his knowledge that anything he says might later be used against him" *(People v Conyers,* 52 NY2d 454, 458 [1981]; *People v Dawson,* 50 NY2d 311, 319-321 [1980]). Thus, the decision to consult with an attorney may be attributable to a variety of reasons that are unrelated to the truth or falsity of the defendant's exculpatory trial testimony. It is, therefore, a fact having minimal probative worth. Moreover, that worth is far outweighed by the risk of prejudice to the defendant and the chilling effect on the exercise of this fundamental right if the State were permitted to attack the defendant's credibility by pointing out that he sought legal advice prior to his arrest. *(See, People v Conyers,* 49 NY2d 174, 182 [1980] [the use of the defendant's silence to impeach him at trial would "place a burden upon the direct exercise of a fundamental right" and would penalize the accused for asserting that right].)

The People concede that cross-examination of a defendant about the exercise of his right to counsel is "impermissible in most circumstances", just as use of the defendant's pretrial silence for purposes of impeachment cannot be justified in the absence of unusual circumstances *(People v Conyers,* 52 NY2d, at 459, *supra).* However, the People argue that circumstances warranting such cross-examination were present in this case, as defendant's own testimony created key issues of fact to be tested. *(See, People v Davis,* 92 AD2d 177, 186-188 [1st Dept 1983], *affd* 61 NY2d 202, 207 [1984].)

It is true that the prohibition barring use of the defendant's silence for purposes of impeachment does not apply where the defendant "is allowed, whether properly or not, to buttress his exculpatory trial testimony", thereby creating "an issue concerning the exact extent of his statements to the police" *(People v Savage,* 50 NY2d 673, 687 [1980] [Gabrielli, J., dissenting]). In this case, however, the prosecutor repeatedly asked defendant questions on cross-examination which were certain to elicit exculpatory testimony not previously offered or suggested by defendant regarding the substance of his prearrest interview. Defendant did not seek "to rely on a claim that he made certain statements to the authorities"

*(supra,* at 687); that fact was revealed only under persistent questioning by the prosecutor. The prosecution, having thus created this collateral issue, should not be permitted to use it as a pretext to introduce prejudicial evidence of little probative value to impeach the defendant, particularly when such a tactic would impinge on the exercise of a fundamental right.

We cannot agree that the circumstances herein justified the repeated cross-examination about defendant's exercise of his Sixth Amendment right to counsel. Inasmuch as credibility was the only issue in this case, the resulting prejudice to defendant cannot be deemed harmless. Concur—Kupferman, J. P., Kassal, Rosenberger, Ellerin and Smith, JJ.