THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v EDWARD CARTER, Appellant.

First Department, August 10, 1989

## APPEARANCES OF COUNSEL

*Kerry Elgarten* of counsel *(Philip L. Weinstein,* attorney), for appellant.

*Gregory L. Waples* of counsel *(Mark Dwyer* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

ROSENBERGER, J.

■ ■ Edward Carter was indicted and convicted, after a jury trial, for the stabbing death of his long-time companion, Charles McCarthy, in the early morning hours of February 15, 1987. On appeal, the defendant contends that the circumstantial evidence presented by the People was insufficient to establish his guilt beyond a reasonable doubt, and that he was deprived of a fair trial by the prosecutor's improper use, as part of the People's direct case, of his postarrest silence and request for counsel. Although this latter issue was not preserved by timely objection as a question of law for our review, we reach it as a matter of discretion in the interest of justice (CPL 470.15 [6] [a]). We find, upon review of the record, that the argument has merit. Consequently, the judgment must be reversed and the matter remanded for a new trial.

At 7:13 A.M. on February 15, the defendant called the police emergency number and reported that a man had come up to the loading dock on West 22nd Street where he and McCarthy were sleeping and "stabbed both of us, and one man [McCarthy] is down and bleeding to death". He added that the assailant was a "white man" who drove off in a "blue car from Jersey" headed southbound on the West Side Highway. The defendant stated that he was bleeding and that the assailant "wanted money from us". When the police arrived at the scene on 22nd Street between Tenth and Eleventh Avenues,

they found McCarthy lying unconscious in a pool of blood on the sidewalk in front of the loading platform and the defendant standing nearby.

The defendant showed the officers a stab wound on his left leg. He told them that earlier, at about 5:00 A.M., he and McCarthy and some other homeless men had been harassed by two white males. The same men returned at about 7:00 A.M. in a blue car with New Jersey license plates. The first man got out of the car with a knife in his hand and stabbed McCarthy several times. He then "handed the knife" to the second man, who stabbed the defendant, put the knife in its sheath and left it on the loading platform. The knife was found on the platform and taken as evidence by the police. The officer did not record this statement until later at the hospital.

The defendant and McCarthy were taken to St. Vincent's Hospital where McCarthy died at 8:25 A.M. While at the hospital, the defendant gave a description of the assailants to the police. The first male, he told them, was white, approximately 27 years old, six feet tall, weighing about 200 pounds, with short brown hair, wearing a green jacket and blue jeans. His accomplice was described simply as a white male, 5 feet 9 inches tall.

The defendant was treated in the St. Vincent's emergency room and then taken to the 10th Precinct for questioning. At about 11:40 the defendant was again interviewed by Detective Frank Tripoli. He related that he and McCarthy had been sleeping on the loading platform and that three of his friends were in the next bay. Three white males approached the area and began throwing bottles and calling the men names. The defendant and McCarthy chased the men "up to Tenth Avenue and 22nd Street" and the men ran away. The defendant and McCarthy returned to the platform and went to sleep. At about 7:00 A.M. 2 of the 3 men returned in a blue car. This time, however, the defendant described the first assailant as a white male, approximately 23 years of age, 5 feet 6 inches, weighing 140 pounds and wearing a blue pea coat. The defendant also made a written statement which did not include any physical description of the attackers.

One hour later, the defendant was interviewed by Detective Timothy Kelly of the Bias Unit, who had been called in to investigate the matter as a possible bias-related incident. The defendant stated that he and McCarthy were homosexual

lovers who had been together approximately seven years. The defendant, whose street name was "Janice", described himself as McCarthy's "common-law wife". On the evening of February 14, the defendant and McCarthy decided to get drunk and purchased a bottle of vodka and a couple of bottles of Wild Irish Rose wine. They went back to the loading platform where they usually slept and got drunk. Some other homeless people were standing around a garbage can fire nearby. It was a cold night and around dawn "three white guys came up from Twelfth Avenue" and began throwing bottles and calling the men "bums". He denied that any antihomosexual or racial epithets were used at that time or when two of the men returned in a car at 7:00 A.M. This statement was recorded by Detective Kelly as the defendant spoke.

When the defendant was again interviewed by Detective Tripoli at about 3:30 P.M. he claimed that McCarthy had been very drunk that evening. However, the People's toxicologist testified at trial that no trace of alcohol or drugs was found in McCarthy's system, although the police did recover a bottle of vodka and one of Wild Irish Rose from the scene of the crime. During this interview, the defendant denied ever having seen the knife, which was recovered from the scene, prior to the stabbing. Two witnesses who knew the defendant and McCarthy testified, however, that they had seen both of them in possession of the knife; that it was their shared property.

During the interview, Detective Tripoli said that the defendant appeared calm and did not seem to be in shock. When he asked to see the wound to the defendant's thigh, the defendant told the detective he would not be able to see it because it was covered with a Band-Aid and a bandage. At the conclusion of the 20-minute interview, he was given some money to get something to eat and asked to return. He did not.

At about 7:20 P.M., the defendant was seen at the emergency room of the Beth Israel Hospital by Dr. Steven Guy whose Grand Jury testimony was read into the record at trial. According to Dr. Guy, the defendant had a deep, penetrating stab wound which had gone almost completely through his left thigh. Although there was "a fair amount of blood" on him, the wound was not bleeding at the time. An area of hematoma, from the collection of blood in the muscle tissue, extended from the defendant's knee almost to his buttocks. Upon probing the wound with a swab, Dr. Guy found that it was at least 5 to 6 inches deep.

According to the defense's medical expert, Dr. Neville Coleman, this appeared to be the same wound that had been treated earlier that day at St. Vincent's Hospital by Dr. Alison Mishkit. Dr. Mishkit, a second-year surgical resident, had found only a "superficial stab wound" on the defendant's left thigh, measuring three centimeters long and one centimeter deep with an external opening of 1½ inches in the skin. The wound was syringed with a sterile saline solution and bandaged, but the doctor did not probe the wound. This, according to Dr. Coleman, was insufficient to reveal the extent of the wound. Given the type of injury, the depth of the wound could only be ascertained by insertion of a probe, he maintained.

The People sought to rebut the contention that the defendant had a serious injury which had not received proper medical care by suggesting that he could have sustained a second stab wound, or could have exacerbated the first one sometime after he left the 10th Precinct. Dr. Guy, when asked to estimate how long ago the injury had been sustained, replied: "I couldn't say. Ten hours or fifteen hours but at least more than a half hour before I saw him." The doctor went on to say that it "[w]ould have taken at least an hour or probably more like two hours" for the blood to "fill up the entire muscle compartment to give him a hematoma like that." The defendant, who did not disclose that the wound had been treated earlier that day at another hospital, was admitted to Beth Israel under the name on the Medicaid card he used, Clarence Mitchell.

The police eventually located the defendant at Beth Israel Hospital, and on February 19 he was arrested and taken to the 10th Precinct. After being read the *Miranda* warnings, the defendant indicated that he was still willing to speak to the police. According to the direct testimony of Detective Jerome Harvey, the defendant repeated his previous statement about what had happened. However, when the detective challenged him by saying that one of the people he had named as a witness, "Junkyard Mike", had not corroborated his story, he became "very fidgety" and said that he would not answer any more questions without a lawyer present. The defendant was not asked any further questions, but while he was being fingerprinted, Detective Tripoli testified on direct examination, the defendant said "I want you to tear up the old statement, I want to make a new one."

The People's case rested entirely on circumstantial evidence of the defendant's guilt. The prosecutor stressed the fact that he had changed his statement to the police on several key points during several hours of questioning after the incident. He gave inconsistent descriptions of the two assailants and he denied to Detective Tripoli that he had ever seen the knife found at the scene prior to the stabbing. However, apart from the defendant's own statement that this knife was the one used by the two assailants, there was nothing to definitively connect this weapon to the crime. The People's witnesses established that there was no blood, nor were any fingerprints on the knife. The medical examiner testified that the knife was "consistent" with the wounds inflicted on the deceased, although he noted there was a feature of the knife "that is incompatible with those wounds."

As evidence of the defendant's motive for the stabbing, the People offered the testimony of Donald Rosser who stated that he had witnessed a fight between the defendant and McCarthy between 7:00 and 9:00 the night before. According to Rosser, the fight occurred after the two returned from chasing the teen-agers who had thrown bottles at them. At one point during the fight McCarthy banged the defendant's head against the metal doors of the loading platform and Rosser heard the defendant say "I'll cut you", to which McCarthy replied, "You're not going to do shit." Eventually the two men stopped fighting and Rosser said that he left the area shortly thereafter. Rosser also testified that the defendant and McCarthy kept a knife in a black bag that they carried.

When asked to be more specific about the time when the fight occurred Rosser said he believed it happened "just before dark" because "it was getting dark around seven or so." It was stipulated that sunset on February 14 was at 5:29 P.M. Rosser acknowledged that he had been drinking Thunderbird wine with three other a men at the time and among them they had shared "a couple of fifths." Rosser, however, denied that he was drunk or that he had any trouble hearing, seeing or comprehending what was going on around him. On cross-examination, Rosser admitted that he had outstanding charges of robbery and assault pending against him.

The prosecutor made a major point of the fact that the defendant refused to make further statements to the police after he had been arrested and advised of his rights, arguing that this was proof of his consciousness of his own guilt. In support of this argument the prosecutor, on direct examina-

tion of three police witnesses, elicited testimony regarding the defendant's invocation of his Fifth and Sixth Amendment rights.

The first such witness, Detective Kelly, was asked whether the defendant had been cooperative during the interview on Sunday, February 15 (when he was not seen as a suspect but as a cocomplainant in a possible bias-related assault), whether he had tried to stop the interview, or had asked for an attorney. Detective Jerome Harvey, who questioned the defendant on February 19 following his arrest, was asked what had happened after the defendant was told that "Junkyard Mike" had given a different account of the incident. On direct examination of Detective Tripoli, the prosecutor elicited testimony about the defendant's demand to tear up his old statement and the detective was also asked what had happened after the defendant was given an opportunity to confer with an attorney:

"QUESTION: Did there come a point in time when this—when the door opened or the meeting ended?

"ANSWER: Yes, it did.

"QUESTION: Were you informed by any—of anything by the lawyer?

"ANSWER: The lawyer said to me that his client was—did not wish to speak to the police further and requested if his client could make a phone call to his stepmother."

This testimony formed the basis for the following argument by the prosecutor on summation: "[W]hen he was eventually confronted by Detective Harvey with the inconsistencies or specifically with Pushcart [sic] Mike's account of what happened, there was a change in the composure of Edward Carter. Subtly, Detective Harvey tells us he became nervous and he asked for a lawyer which he had not done up to that point, which was his right, he could have always exercised, but he chose to do it at this particular time."

■ This testimony elicited on the People's direct case and the comment on it in the prosecutor's summation were plainly improper. It has "long been and remains the law in this State that a defendant's silence cannot be used by the People as a part of their direct case" (People v Conyers, 49 NY2d 174, 177 [1980], citing People v Rutigliano, 261 NY 103 [1933]; People v Pavao, 59 NY2d 282, 292 [1983]; People v Von Werne, 41 NY2d 584, 587 [1977]). The Court of Appeals has repeatedly pointed out that the probative value of the defendant's pretrial failure

to speak when confronted by law enforcement officials is of extremely limited probative value *(People v Conyers, supra,* 49 NY2d, at 181-182; *People v Dawson,* 50 NY2d 311, 319-321 [1980]). This minimal probative value is far outweighed by the chilling effect the use of a defendant's pretrial silence or invocation of his right to counsel has on the exercise of these fundamental liberties.

A defendant's reticence during a custodial interrogation may be due to natural caution, mistrust of law enforcement officials, or from the belief "that efforts to exonerate himself under the circumstances would be futile" *(People v Conyers,* 52 NY2d 454, 458 [1981]). Even when used solely to impeach a defendant who has taken the stand, evidence of the defendant's pretrial silence "must be regarded as having minimal probative significance and as having a correspondingly low potential for advancing the truth-finding process" (52 NY2d, at 458-459). In *People v Collins,* this court found that the prosecution's cross-examination of a defendant about the exercise of his right to counsel was improper, even for impeachment purposes, where the prosecutor had elicited exculpatory testimony not previously offered or suggested by the defendant on direct examination (140 AD2d 186 [1st Dept 1988]).

Although the People argue on appeal that there was a substantial and unacceptable risk that the jurors would have been mislead had the prosecutor attempted to avoid all references to the defendant's request for counsel in the direct examination of Detectives Harvey and Tripoli, we cannot agree. There was no necessity whatever for the prosecutor to inquire about what happened after the defendant conferred with counsel, nor any need for the jury to know if Detective Tripoli knew the reason why Detective Harvey's interview with the defendant had concluded. This testimony, as part of the People's direct case and the comments thereon in the prosecutor's summation, were plainly improper and violative of the defendant's rights.

Given the less than conclusive nature of the circumstantial evidence in this case, it cannot be said that these errors were harmless. Defense counsel did not seek, nor did the court give any curative instructions regarding this testimony or the comments thereon in the prosecutor's summation. Thus, the likelihood that these uncorrected constitutional errors contributed to the defendant's conviction cannot be discounted. *(People v Conyers, supra,* 49 NY2d, at 183.)

Accordingly, the judgment of the Supreme Court, New York County (Robert Haft, J.), rendered November 18, 1987, convicting the defendant, after jury trial, of manslaughter in the first degree and sentencing him to a term of 6 to 18 years' imprisonment, should be reversed on the law, the facts and as a matter of discretion in the interests of justice, and the matter remanded for a new trial.

KASSAL, J. (concurring). I concur with the majority solely on constraint of *People v Von Werne* (41 NY2d 584, 587-588).

MILONAS, J. (dissenting). In my opinion, the judgment of conviction should be affirmed.

Notwithstanding the fact that the defense failed to object before the trial court that the prosecutor wrongfully elicited testimony, and commented upon during summation, concerning defendant's assertion of his right to remain silent, which issue was, therefore, not preserved on appeal *(see, People v Ford,* 69 NY2d 775), it is proposed that this court now review this contention in the interests of justice. However, defendant should not be permitted to complain on appeal about something which, it is clear, his counsel not only did not challenge below but made affirmative use of in presenting his defense to the jury. In that connection, defendant's attorney, deliberately and as a matter of trial tactics, endeavored to persuade the jury that the police, having conducted an incomplete and perfunctory investigation into the deceased's homicide, had mistakenly accused defendant, an innocent eyewitness, of the crime since he was the most convenient suspect. Thus, at neither the pretrial colloquy nor in his omnibus motion did the defense attorney ever move to exclude any reference to defendant's having asked for a lawyer. On the contrary, defendant's attorney advised the court during the pretrial colloquy that it was his intention to attack the conduct of the police and the District Attorney in the questioning of defendant, resulting in a motion for recusal of the trial assistant. This strategy became evident in the course of the trial. Consequently, in an effort to counter the People's circumstantial case against defendant, it suited his purpose to emphasize his client's cooperation with the authorities, reminding the jury that defendant's helpful attitude changed only when the police rewarded defendant's assistance by indicating that he was under arrest. Accordingly, defendant's counsel stated during his summation:

"The only time that the police ever really as investigators

gave Mr. Carter a chance and told them what somebody else had said and that their investigation had turned out contrary evidence as to what he said, the fact that they arrested him, they had gone to the hospital, they handcuffed him, they take him out of the hospital, they take him out of the Precinct, they sat him down, bring him another police officer in, another detective, this time Detective Harvey to talk to him and they tell him that they talked to Pushcart Mike and Mike says that the story is not—that the bottle throwing incident took place the night before and not in the morning.

"And, finally, the light goes on, Edward Carter realizes that the police intend to charge him in this case and very, very suspiciously at that point says he wants to speak to a lawyer. Bad citizen."

Indeed, an examination of the trial transcript reveals that defendant's counsel did not merely make reference to his client's desire to speak with a lawyer in order to rehabilitate the defense case in reaction to the People's position but that the entire sequence of events surrounding defendant's encounter with the police, including defendant's having requested a lawyer, was crucial to the defense strategy. The minutes, therefore, demonstrate that it was counsel's intention to communicate to the jury his contempt for the conduct of the police and, by implication, the prosecution, in hastening to condemn defendant without good cause simply because he was an easy target. As counsel noted, apparently in a sarcastic tone, regarding defendant's having finally terminated his cooperation with the police: "They arrest him, they take him into custody. After he is in custody and no longer in this atmosphere having to try to figure out what happened here, but having been cuffed and ridden around in a police car, he is then placed under arrest. And, then again, very suspiciously he stops talking. I don't think it's—I think it's not reasonable not to doubt Edward Carter's guilt in this case, I don't see how you can possibly not have far from reasonable but compelling doubt."

Moreover, while it is true that the District Attorney did, in his summation, make some mention of defendant's request for a lawyer, he did so largely in the context of commenting on the defense's effort to portray defendant as a victim of police incompetence. At no time did the prosecutor urge that defendant's silence was proof of guilt. In fact, even the District Attorney's statement that "we have the evidence of a guilty mind", although unfortunate, was not uttered specifically in

connection with defendant's having asked for a lawyer but with respect to his general conduct. The Court of Appeals has acknowledged that there may be unusual circumstances when use of a defendant's pretrial silence is not precluded *(People v De George,* 73 NY2d 614; *People v Conyers,* 52 NY2d 454). The situation herein presents precisely such an exception to the general rule barring admission of evidence of pretrial silence; at any rate, the circumstances of this case do not warrant that we reach out in the interests of justice to consider a claim that is being raised for the first time on appeal.

MURPHY, P. J., and SMITH, J., concur with ROSENBERGER, J.; KASSAL, J., concurs in a separate opinion; MILONAS, J., dissents in a separate opinion.

Judgment, Supreme Court, New York County, rendered on November 18, 1987, reversed, on the law, the facts and as a matter of discretion in the interests of justice, and the matter remanded for a new trial.