[617 NYS2d 751]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
ORLANDO NIEVES, Appellant.

First Department, November 1, 1994

## APPEARANCES OF COUNSEL

*Michael Eisenstein* for appellant.

*Stanley R. Kaplan* of counsel *(Billie Manning* with him on the brief; *Robert T. Johnson, District Attorney* of Bronx County, attorney), for respondent.

## OPINION OF THE COURT

RUBIN, J.

Appellant, acting in concert with John Stokes and Evelyn Smith, robbed a Getty Mart convenience store in Greenwich, Connecticut, in the early afternoon of May 18, 1990, during which he demanded money from an employee at knifepoint. Stokes was tried separately and convicted of murder in the second degree, unauthorized use of a motor vehicle in the first degree, reckless endangerment in the first degree and leaving the scene of an accident without making a report for which he received concurrent terms of imprisonment of 25 years to life, 2⅓ to 7 years, 2⅓ to 7 years and 1 to 3 years, respectively. Smith pleaded guilty to attempted murder in the second degree and was sentenced to a term of 6 to 18 years' imprisonment.

On May 18, 1990, at approximately 12:45 P.M., Detective Joseph Gavin of the Greenwich, Connecticut, Police Department was assigned to surveillance duty at a Getty Mart located at 1324 East Putnam Road when he observed a light-colored, older-model Chevrolet pull into the lot at the furthest point from the building and the gas pumps. He saw appellant and a woman emerge from the car and walk quickly to the store. As Detective Gavin maneuvered his unmarked car to get a better view, the driver of the Chevrolet started to back out of the parking space. The detective notified headquarters that something unusual was happening.

Inside the store, Shyam Lal was working behind the counter when appellant entered. Appellant pulled out a knife, came around the counter, put the knife to Mr. Lal's stomach and ordered him to open the cash register. A female then joined appellant. She grabbed about $100 from the cash register and took between 5 and 10 cartons of cigarettes, placing the money and the cartons in a plastic bag. Appellant and the woman left, telling Lal not to touch anything. When they were gone, Lal sounded the store's alarm.

Detective Gavin saw appellant and the woman run from the store to the Chevrolet. Appellant had something in front of him and the woman appeared to be carrying a bag or a cloth. Appellant entered the rear of the car and the woman entered the right front passenger's side. The car then proceeded at a high rate of speed out of the exit with Detective Gavin in pursuit. Detective Gavin notified headquarters and another police car, stationed at Exit 5 on Interstate I-95, of a possible robbery.

As he followed the car, with his lights and siren activated, the detective watched the police car stationed at Exit 5 pull out to block the road. The Chevrolet swerved to the left, however, and proceeded onto the Thruway, heading southbound towards New York City. The car continued to swerve from lane to lane at speeds up to 80 or 90 miles per hour.

At about this time, Captain Peter Robbins of the Greenwich, Connecticut, Police Department, who had directed the surveillance at the Getty Mart and monitored the radio transmissions, drove to the on ramp of I-95 at Exit 3, accompanied by Sergeant James Walters. They saw the suspects' car on I-95 being followed by an unmarked police car. Captain Robbins drove his vehicle in the right lane of I-95, intending to box in the Chevrolet behind another police car that had pulled in front. The Chevrolet swung to the left, however, overtaking the police car ahead of it. The suspects' car then moved into the fast lane, continuing at a high rate of speed and eventually crossing the State line to New York. As Captain Robbins managed to get his vehicle into proximity, Sergeant Walters pointed his service revolver at the driver of the Chevrolet. The driver responded by making an obscene gesture with the middle finger of his hand, while appellant ducked down in the back seat. The driver then swerved the Chevrolet to the left, forcing Captain Robbins to continue following behind it. When Captain Robbins again tried to pull alongside, the Chevrolet swerved, forcing the captain into a breakdown lane.

The chase continued through the New Rochelle Toll Plaza. The Chevrolet was travelling in a lane closed to traffic, sending traffic cones flying and forcing two workers to get out of its path. Captain Robbins, still following along behind, never saw any brake lights, while observing on his own speedometer that he was going 80 miles per hour. Captain Robbins contin-

ued to simply follow the Chevrolet because the driver's repeated swerving made it too dangerous to approach. In the vicinity of Exit 10 on I-95, the captain noticed that the car had a "blow out" on the right rear tire. The driver did not brake or slow down, even though the car was now riding only on the rim of that wheel.

When the flow of traffic on I-95 became blocked, the Chevrolet left the highway at Exit 11 (Bartow Avenue, Bronx County), with Captain Robbins' car following behind. The suspects' car proceeded down a ramp, approaching the intersection of Edison and Bartow Avenues. There, a panel truck, flanked by two passenger cars, was stopped at a red light. The getaway car approached the left side of the truck and the passenger side of the car situated to its left. As traffic started to move after the light turned green, the right side of the suspects' car appeared to Captain Robbins to contact the left side of the panel truck. The Chevrolet then started to swing to the left. As Captain Robbins proceeded down the ramp towards the right side of the roadway, the panel truck veered to the right, colliding with the left side of Captain Robbins' car.

The Chevrolet, occupied by appellant and his codefendants, cleared the intersection going backwards across Edison Avenue. It hit a bus shelter and continued for a short distance before coming to a halt. Sergeant Walters observed that, upon impact with the bus shelter, a woman who was standing at the bus stop was tossed into the air.

Police Officer Timothy Biggs of the Greenwich, Connecticut, Police Department saw the woman, identified as Ms. Gladys Davis, lying on the sidewalk. She was unconscious and bleeding heavily. Part of her lower leg had been severed. Since Officer Biggs was an emergency medical technician, he tried to assist the woman, applying a tourniquet and giving her oxygen. He called for an ambulance, which arrived 5 to 10 minutes later. Ms. Davis subsequently expired at the hospital.

Sergeant Rick Cochran of the Greenwich, Connecticut, Police Department saw appellant and two others exit the car. Appellant, holding a knife in his right hand, ran through a parking lot. Sergeant Cochran saw an off-duty officer pursue appellant, stating, "Police, drop the knife". Although the off-duty officer had drawn his revolver, pointed it at appellant and told him three times to drop the knife, appellant refused. Sergeant Cochran then signaled his police dog to subdue appellant. The dog brought appellant down, causing him to drop the knife, which the sergeant secured. The sum of $104

was recovered from appellant's right front pocket. Upon examining the interior of the Chevrolet, Sergeant Cochran found a number of cigarette cartons on the floor in the area of the passenger seat.

Detective Hans Hansen of the Greenwich, Connecticut, Police Department, with his partner, Detective Richard Haug, joined the chase towards the end of the pursuit. Detective Hansen spoke to appellant in the back seat of a police car, informing appellant of the officer's capacity and reading appellant his *Miranda* rights. Appellant indicated that he understood his rights and stated that he had been involved in a robbery at a gas station in Greenwich and that, earlier in the day, he had recruited John Stokes to be the driver of the getaway car. He further admitted that the knife belonged to him.

Detective John Collins of the New York City Police Department Highway Unit Number One, Accident Investigation Squad, responded to the scene and examined the Chevrolet used in the robbery. He found no indication that the car had been struck by another vehicle.

On May 19, 1990, an autopsy was performed on Ms. Davis. The cause of death was determined to be skeletal fractures with near amputation and bleeding due to blunt impact. Her injuries were consistent with being hit by a car.

Following a two-week jury trial during which the People presented 14 witnesses, appellant was convicted of murder in the second degree based upon the felony murder provision of the homicide statute (Penal Law § 125.25 [3]). Given the circumstances, including the identification of appellant by the Getty Mart employee, the observation of the escape from the scene of the crime by Detective Gavin, the apprehension of the robbers after a car chase and the recovery of about $100 in currency and cartons of cigarettes taken from the convenience store, the proof of appellant's participation in this crime is overwhelming.

The bulk of appellant's arguments on appeal concern the jurisdiction of the courts of this State to try him for felony murder in connection with a felony committed outside the State. Essentially, appellant asserts that the felony murder statute represents merely a sentence-enhancement device. Therefore, he concludes, the courts of the State in which the underlying felony was committed should have exclusive jurisdiction to prosecute those involved in the crime.

Appellant further argues that the exercise of jurisdiction by the State of New York is barred by CPL 20.20 because he lacks accessorial accountability for the conduct of John Stokes in causing the death of Gladys Davis (Penal Law § 20.00). He notes that the felony murder statute requires "more than a coincidence of time and place" to hold him responsible. Appellant avers that he did no more than passively sit in the back seat of a car, recklessly driven by a codefendant who, appellant contends, is solely responsible for the victim's death and who should alone bear the punishment. Finally, appellant contends that New York has no interest in prosecuting him in connection with this crime because no deterrent purpose will be served in this State by punishing him in New York for a felony committed in Connecticut.

This Court shares neither appellant's fanciful portrayal of the facts of this case nor his peculiar perspective on the law of this State. We reject the suggestion that New York State has no interest in punishing felons whose acts of mayhem within its borders result in death. This State has an obvious interest to deter dangerous acts, such as driving at excessive speed with defective automotive equipment (a burst tire) in what amounts to a display of reckless indifference to human safety. Similarly, we reject appellant's contention that the felony murder statute should not apply to this case because the death of Gladys Davis was "demonstrably accidental or unintended".

The Legislature is free to decide what quantum of criminal conduct in New York will suffice to support the exercise of criminal law jurisdiction *(People v Werblow,* 241 NY 55, 61). Under the felony murder rule, felons fleeing in a speeding car which crashes and kills an innocent person are all equally responsible for that obviously foreseeable consequence, regardless of which felon was actually driving and notwithstanding the possibility that police conduct during the chase may have been a contributing cause of the crash *(People v Falu,* 138 AD2d 510, *lv denied* 71 NY2d 1026).

Felony murder is based upon a defendant's participation in one of a number of specified crimes, resulting in a death. As pertinent to the facts of this case, a defendant is guilty of felony murder when, as defined by Penal Law § 125.25 (3): "Acting either alone or with one or more other persons, he commits or attempts to commit robbery * * * and, in the course of and in furtherance of such crime or of immediate flight therefrom, he, or another participant, if there be any,

causes the death of a person other than one of the participants".

CPL 20.20 provides that:

"a person may be convicted in the criminal courts of this state of an offense defined by the laws of this state, committed either by his own conduct or by the conduct of another for which he is legally accountable pursuant to section 20.00 of the penal law, when:

"1. Conduct occurred within this state sufficient to establish:

"(a) An element of such offense".

Penal Law § 20.00, governing accessorial conduct, provides: "When one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct."

Felony murder has two elements: the commission of a specified felony and death to a nonparticipant in the crime, either during the course of the felony or in the immediate flight therefrom (*People v Spivey*, 81 NY2d 356, 361). "By operation of law, the intent necessary to sustain a murder conviction is inferred from the intent to commit a specific, serious, felonious act, even though the defendant, in truth, may not have intended to kill" (*People v Gladman*, 41 NY2d 123, 125). Both elements of felony murder are established by the overwhelming evidence presented in this case. Despite appellant's attempt to read into the statute, felony murder does not require that the underlying felony take place in this State. Rather, it is sufficient that one of the elements of the offense takes place in New York State (CPL 20.20 [1] [a]).

The contention that felony murder is designed merely to enhance punishment for commission of the predicate felony is unpersuasive. It should be noted that robbery is itself an aggravated theft offense that carries an enhanced penalty on the rationale that mere theft "lacks the threat of bodily harm or force that makes robbery such an inherently dangerous and violent crime" (*Ryder v City of Topeka*, 814 F2d 1412, 1420). As the Appellate Division, Second Department, stated in *People v Santiago* (62 AD2d 572, 579, *affd* 48 NY2d 1023), "[T]he law of robbery, and indeed other forms of aggravated theft, developed 'to protect not only against misappropriation [of property] but also against injuries which may result from

peculiarly dangerous means devised for accomplishing misappropriation' (Note, 54 Col L Rev 84). 'Regardless of the success of the misappropriation, aggravated theft is always accompanied by the possibility of physical or psychic injury to the victim' " (quoting Note, 54 Col L Rev 84, 109). Status as an aggravated form of another offense, distinguished in the case of robbery by the employment or threat of force, does not thereby render force any less viable as an element of the crime.

Conviction for felony murder will be sustained even where the assailant intended only to snatch a purse *(People v Santiago,* 62 AD2d 572, *supra* [victim crushed between subway car and platform]) or burglarize a dwelling *(People v Ingram,* 67 NY2d 897 [victim of burglary attempt dies from myocardial infarction]). Just as force is a distinct element of the crime of robbery, death is an element of felony murder, and the occurrence of a death in this State as a consequence of the commission of a designated felony provides ample basis for the exercise of jurisdiction by our courts (CPL 20.20 [1] [a]).

Appellant's characterization of his role in the escape is disingenuous. He was not, as he asserts, merely a passive, even captive, participant in the attempt to escape from the pursuing police officers. To the contrary, it is clear that he planned to use a motor vehicle as a means of escape, having recruited codefendant Stokes to be its driver. In addition, from the description of the getaway given by Detective Gavin, on surveillance duty at the convenience store, it is apparent that Stokes was carrying out a planned departure from that location.

Appellant obviously shared the interest of the other two participants in the success of their criminal enterprise. Similarly, appellant and Evelyn Smith were united with Stokes in their interest in evading capture. As the Court of Appeals noted in *People v Hernandez* (82 NY2d 309, 319), "[i]mmediate flight and attempts to thwart apprehension are patently within the furtherance of the cofelons' criminal objective" (citing *People v Gladman,* 41 NY2d 123, 129, *supra).* In fact, appellant continued to demonstrate his own interest in eluding apprehension even after the vehicle crashed into the bus shelter in Bronx County, some 15 minutes or so after the robbery took place, by running from the car grasping a knife and only stopping when his path was blocked. Even then, he refused to drop the knife until attacked by a police dog.

It is evident that appellant willingly participated in a plan to escape from the scene of a robbery in a motor vehicle. His role in the escape is that of someone who "solicits, requests, commands, importunes, or intentionally aids" (Penal Law § 20.00) the driver to elude capture. Even if this Court were to accept appellant's theory that prosecution in this State requires accessorial capacity in the conduct causing death within its borders, any such requirement is fulfilled by his acquiescence in use of a motor vehicle to flee the scene. As the Court of Appeals recently emphasized in *People v Matos* (83 NY2d 509, 511), "[t]he accused need not commit the final, fatal act to be culpable for causing death." Under the particular circumstances of this case, it is more than sufficient that appellant, by his recruitment of Stokes to drive the getaway car, set in motion a series of events that ultimately resulted in the death of the victim *(People v Kibbe,* 35 NY2d 407).

Finally, appellant cannot complain that he is being punished for an "accidental" injury resulting in the death of Gladys Davis. The use of a motor vehicle to flee from the scene of a crime carries the obvious risk that any consequent pursuit by law enforcement officers will result in the resort to dangerous driving in an attempt to avoid arrest. The attendant risk of injury, both to the officers giving chase and to the general public, is readily foreseeable. To the extent that holding appellant accountable for a foreseeable though unintended consequence of his felonious conduct will deter similar reckless behavior in this State, the interests of New York in the preservation of public safety are advanced. This Court therefore finds no impediment to the exercise of jurisdiction over appellant, nor to his punishment for his role in causing the death of Gladys Davis.

Were we to review, in the interest of justice, appellant's unpreserved claim that the court should have submitted the issue of jurisdiction to the jury, we would find it without merit because the issue of jurisdiction in this case is purely legal and not factual *(People v Moore,* 46 NY2d 1, 6-7; *Matter of Steingut v Gold,* 42 NY2d 311, 316; *People v Tullo,* 34 NY2d 712, 714).

◼ Taking appellant's remaining points in logical sequence, his contention that his confession should have been suppressed because it was the product of unlawful police force is without merit. Specifically, appellant alleges that he was suffering abdominal pain because the police dog bit him in the

groin. This argument was the subject of a *Huntley* hearing. It was the court's determination that appellant was not under any serious physical duress, that there was no coercion by the police, and that his statement was completely voluntary. Appellant, however, claims that this Court should, at a minimum, remand the matter for a further *Huntley* hearing in the light of evidence adduced at trial which, he asserts, suggests that the use of the dog may constitute an excessive use of force under the circumstances.

The factual findings of the hearing court are entitled to great weight *(People v Leonti,* 18 NY2d 384, 390, *cert denied* 389 US 1007; *People v Benitez,* 162 AD2d 100, 101), and will be accorded deference when grounded in the record *(People v Terry,* 155 AD2d 391). The police are not barred from taking a statement from a suspect who is still suffering from injuries received at the time of his arrest, even resulting from excessive force, where there is no causal connection between the injuries and the statement *(People v Hill,* 17 NY2d 185, 190, *cert denied sub nom. Catanzaro v New York,* 385 US 875). Here, the force applied to appellant was for the legitimate purpose of causing him to relinquish control over a weapon and as an alternative to the use of deadly force (Penal Law § 35.30 [1] [a], [b]), and this Court perceives no causal connection between the application of that force and the statement given by appellant *(People v Alvarez,* 186 AD2d 56).

■ Evidence received at trial is not a proper basis upon which to review the propriety of a determination made at a pretrial hearing. Thus, the voluntariness of a confession must be viewed in the light of evidence available to the court at the time of the hearing *(People v Gonzalez,* 55 NY2d 720, 721-722). Moreover, there is no indication that defense counsel ever sought leave to reopen the *Huntley* hearing based on developments at trial, and the issue is therefore unpreserved for review.

■ Appellant also contends that loss of an index card on which Detective Hansen originally recorded the confession warrants per se reversal of his conviction under the rule of *People v Rosario* (9 NY2d 286, *cert denied* 368 US 866), as extended by *People v Jackson* (78 NY2d 638). In *People v Boyd* (189 AD2d 433, *lv denied* 82 NY2d 714), this Court observed that loss or destruction of notes routinely transferred to a typewritten report does not constitute a lack of diligence in preserving evidence and, even where the existence of additional notes can be established, a defendant's remedy is to

request the imposition of an appropriate sanction. In the absence of a sanction demand, the issue is waived *(People v Rogelio,* 79 NY2d 843, 844).

There is no indication that the information on the index card was inaccurately transferred to the typewritten report *(see, People v Serrando,* 184 AD2d 1094, *lv denied* 80 NY2d 837) or that appellant was prejudiced in any way. His statement is a confession to the robbery, and appellant does not and cannot dispute his participation in the underlying crime. There is therefore no reason to review the issue in the interest of justice.

■ Appellant's absence from colloquies with sworn jurors, attended by his counsel, is of no moment. Counsel conveyed appellant's consent to the court *(see, People v Perez,* 196 AD2d 781, *lv denied* 82 NY2d 900), and it is well settled that a defendant's presence is not required during inquiry regarding the impact of health or employment concerns on a juror's ability to serve *(People v Velasco,* 77 NY2d 469, 472-473; *see, People v Mullen,* 44 NY2d 1).

■ Neither is there merit to the argument that, in repeating felony murder instructions, Supreme Court should also have repeated its instructions on the affirmative defense to felony murder (Penal Law § 125.25 [3]). Again, counsel expressly agreed to the procedure employed. In addition, a request for reinstruction on the elements of a crime does not oblige the court to address defenses to that crime *(People v Allen,* 69 NY2d 915, 916).

■ This Court finds no abuse of the discretion vested in Supreme Court to impose an appropriate sentence and will not disturb its determination *(People v Davis,* 92 AD2d 177, 189, *affd* 61 NY2d 202; *People v Junco,* 43 AD2d 266, 268, *affd* 35 NY2d 419, *cert denied* 421 US 951). The sentence imposed upon appellant in this case cannot be regarded as excessive in view of three earlier felony convictions, appellant's candid concession to police that he had robbed the convenience store on two prior occasions, his use of a weapon and the deadly consequences of this crime.

We have considered appellant's remaining contentions, including those contained in his *pro se* supplemental brief, and find them largely unpreserved and entirely without merit.

Accordingly, the judgment of the Supreme Court, Bronx County (Vincent Vitale, J.), rendered November 13, 1992, convicting appellant, after jury trial, of murder in the second

degree, and sentencing him to a term of 20 years to life, should be affirmed.

SULLIVAN, J. P., CARRO, ROSENBERGER and WALLACH, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered November 13, 1992, affirmed.