[666 NYS2d 565]

The People of the State of New York, Appellant, v David Sandy, Respondent.

First Department, December 4, 1997

### APPEARANCES OF COUNSEL

*Gina Mignola* of counsel *(Amyjane Rettew* and *Nikki Kowalski* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for appellant.

*John R. Wing* of counsel *(Christopher J. Morvillo* on the brief; *Weil, Gotshal & Manges, L. L. P.,* attorneys), for respondent.

### OPINION OF THE COURT

RUBIN, J.

This is an appeal by the People from an order dismissing an indictment charging defendant with one count of conspiracy in the fifth degree (count one) and two counts of tampering with physical evidence. Count two, predicated on the commission of an act within New York County, was dismissed by Supreme Court as being unsupported by the record and is not at issue on this appeal. All other acts ascribed to defendant in furtherance of the conspiracy to conceal evidence are alleged to have occurred in foreign countries. The remaining tampering charge (count three) is based on the injured forum theory of jurisdiction (CPL 20.20 [2] [b]). As to counts one and three, Supreme Court ruled that the People failed to demonstrate how the concealed evidence would have assisted the Grand Jury in its investigation. Therefore, it concluded, no materially harmful impact upon the governmental processes of this State has been made out so as to support the exercise of criminal jurisdiction (CPL 20.10 [4]).

The indictment in this case arises out of the collapse of the Bank of Credit and Commerce International (BCCI), which resulted in losses of over $9 billion to the bank's depositors and creditors. It is alleged that the bank was founded in 1972 "with backing from members of the royal families of the United Arab Emirates." Operated as what the prosecution terms "a worldwide Ponzi scheme", BCCI hid years of sustained losses from bank regulators, evading detection by inflating valid assets, creating fictitious assets, hiding bad debts and exploiting its multinational structure, which enabled the bank to conceal its ownership of The First American Bank of New York. By the spring of 1990, the bank's losses had assumed such proportions that Swaleh Naqvi, then Chief Executive Officer, was obliged to disclose its true financial condition to the ruler of Abu Dhabi. Attempts at reorganization followed but to no avail and, on July 5, 1991, the bank was seized by regulators and liquidated.

As a result of the reorganization effort, a controlling interest in BCCI of approximately 70% had been acquired by the ruler of Abu Dhabi and certain other officials and agencies of that country, one of seven emirates comprising the United Arab Emirates. The majority shareholders retained the London firm of Simmons & Simmons to provide representation in connection with potential civil litigation and related matters arising out of the bank's demise. Defendant, a partner in the firm, was assigned to work on the matter in Abu Dhabi. The Washington, D.C. firm of Patton, Boggs & Blow (now Patton, Boggs, L. L. P.) was retained as United States counsel.

In 1989, a New York County Grand Jury began an investigation into BCCI's operation, seeking to determine its real owners, their knowledge of its true financial condition and the extent of their secret ownership and operation of United States banks. On July 29, 1991, the Grand Jury returned an indictment against BCCI and its first two Chief Executive Officers, charging those defendants with perpetrating a scheme to defraud in the first degree, grand larceny in the first degree and falsifying business records in the first degree. In 1992, the United States Department of Justice brought additional charges of racketeering and conspiracy against BCCI and two of its former officers.

The main institutional component of BCCI was BCCI Holdings, which was chartered in Luxembourg. A Luxembourg court appointed a partner in the London office of Touche Ross, Brian Smouha, to wind up BCCI's affairs. In December 1991,

the liquidator entered into a negotiated plea agreement on behalf of the bank. For its part, Touche Ross promised to cooperate with ongoing State and Federal investigations by producing "investigative information", defined in the agreement as "documents, records, tangible evidence or other information concerning BCCI and related activities, individuals and entities requested by [the Department of Justice] or [the New York County District Attorney's office]."

In connection with the attempted reorganization, the majority shareholders had relocated the bank's headquarters from London to Abu Dhabi. They also removed Swaleh Naqvi as Chief Executive Officer. The new appointee, Zafar Iqbal, maintained an office in downtown Abu Dhabi known as the Shareholders Coordination Office or "SCO", which was used to store sensitive documents of concern to the majority shareholders. It was Iqbal's practice to keep a diary of his meetings with various government officials and others on behalf of the bank. He recorded his notes on a Casio hand-held computer, transferring the information to a Commodore laptop when the Casio's memory became full.

The location of the computerized "Iqbal diary", as it came to be referred to, became a matter of concern following Iqbal's arrest by local authorities on September 8, 1991 along with two dozen other senior managers of the bank. The diary assumed increased significance when the December 19, 1991 plea agreement was announced, imposing upon the liquidator a blanket obligation to turn over relevant documents, even in the absence of a specific request. Defendant's apprehension was aroused on January 29, 1992 when he and another solicitor from the London law firm, Shaun Elrick, visited the Shareholders Coordination Office and discovered employees of Touche Ross reviewing and copying documents. While at the SCO, Elrick found an envelope containing three computer disks, which he suspected as being the backup of the files comprising the Casio digital diary of Zafar Iqbal. Defendant decided to remove the disks from the SCO in order to ascertain their contents. That same day, defendant informed Colin Passmore, a partner at Simmons & Simmons, via facsimile transmission, of the removal of the disks, which defendant "suspected might contain the Zafar diaries. If so, clearly we must ensure that Touche Ross do not have access to it [sic]."

In a memorandum to file dated February 2, 1992, defendant enumerated documents considered "sensitive to the Majority Shareholders". These, the memorandum states, consist of

"documents created in 1990 and 1991; documents relating to UAE nationals and, in particular, loan documents etc. in relation to some of the representatives of the Majority Shareholders." The memorandum expresses a concern "in respect of the plea bargain entered into by Touche Ross. We did not wish to find that documents had been taken out of the UAE by Touche Ross and then had to be provided to the US prosecuting authorities who had taken a very biased attitude to the Majority Shareholders." In defendant's view, it fell to counsel, "Simmons & Simmons, to ensure that no sensitive document fell into the wrong hands."

With the assistance of Robert Churchhouse, an accountant and computer expert employed by the majority shareholders, defendant was able to access the disks, which did in fact contain Iqbal's diary entries. Defendant made copies of the files onto other disks and printed a hard copy. Defendant then directed Churchhouse to erase the original disks in such a way that the data could never be retrieved. Thereafter, defendant asked Shaun Elrick to return the now-blank original disks to the package at the SCO from which they had been taken, "so as not to alert the occupants of the flat [the apartment housing the SCO] that they had been removed". However, Elrick found that the envelope had been stapled shut and therefore returned the disks to defendant, who later returned them to the SCO himself.

On December 18, 1992, defendant met with officials from the New York County District Attorney's office, but he avoided any mention of the Iqbal diary during the course of the discussion. In January 1994, the United States authorities entered into an agreement not to prosecute Abu Dhabi nationals, either criminally or civilly, in connection with the BCCI failure. The majority shareholders agreed, among other things, to turn over all BCCI documents to the liquidator by April 1, 1994.

By this time, it had come to the attention of the liquidator that Zafar Iqbal was in the habit of recording notes on an electronic organizer. However, at a February 9, 1994 meeting with Touche Ross representative Geoff Eales, defendant avoided disclosing that he or Simmons & Simmons possessed Iqbal's Casio organizer or his diaries. In a memorandum of that same date, defendant states that he limited his response to speculation as to where the Casio electronic organizer might be located, which "successfully diverted the conversation." When John Moscow, an Assistant District Attorney for New York County, requested access to Iqbal's "computer" during a

meeting on March 3, 1994, defendant once again stated where he believed the machine to be located, without disclosing the fact that he retained the disks and printouts of the Iqbal diary.

By memorandum dated March 17, 1994, defendant sent the draft of a position paper to Simmons & Simmons' solicitor Jerry Walter, discussing "whether we should provide the US authorities with access to Iqbal's computer, computer disk and/or diary." The position paper recommends production of the Commodore computer and the hard copies of the diary, and contains a telling admission: "Because of the sensitivity of the diary, I arranged for the disks to be temporarily removed from the SCO files and copied. The original disks were then wiped clean and returned. These original disks will be handed over to the liquidators in due course. Although we do have copy disks containing what was on the originals, I would not advocate offering these to the US authorities because this will focus attention on what happened to the original disks. It also seems to me that the US authorities will be very keen to take copies of the disks themselves if they know that they exist." By memorandum to file dated March 29, 1994, Charles "Rick" Talisman, a partner at Patton, Boggs, the majority sharehold-ers' United States counsel, memorialized a telephone conversa-tion in which defendant stated that he returned the blank original disks to the SCO because an inventory was being conducted and he was concerned the disks would be noted as missing. In April 1994, Patton, Boggs' lawyers informed the District Attorney of the disk erasures. When subsequently asked by Andrew Finan, an investigator for the District At-torney's office, why the disks had been wiped clean, even though the liquidator had a right to them, defendant replied, "It is an anomaly."

In April 1995, the subject indictment was returned against defendant charging him with conspiracy in the fifth degree and with two counts of tampering with physical evidence, both concerning the Iqbal diary. As noted, jurisdiction to prosecute the first tampering count, not at issue, is predicated upon acts within New York County, while jurisdiction over the second tampering count is based on the "injured forum" theory (CPL 20.20 [2] [b]; see also, CPL 20.40 [2] [c]). It is the People's posi-tion that, although defendant's conduct in concealing the exis-tence of the Iqbal diary took place outside New York's geographical boundaries, such conduct had, or was likely to have, a "particular effect" upon the New York County Grand Jury proceedings so as to support jurisdiction under the stat-ute.

In ruling on defendant's motion to dismiss the indictment on the basis of, *inter alia*, lack of criminal jurisdiction, Supreme Court found "there was evidence that defendant intended and knew that his actions were interfering with the production of evidence before a sitting grand jury." The court nevertheless granted the motion and dismissed the indictment on the ground that the People had failed to specify what information contained in the diary would have influenced the Grand Jury investigation (or any other New York proceeding) had the People acquired it earlier. Thus, the court concluded, even though defendant had the requisite criminal intent to bring about a particular effect within the jurisdiction, the People have not demonstrated that it produced a "materially harmful impact" within this State (citing *Matter of Steingut v Gold*, 42 NY2d 311; *People v Fea*, 47 NY2d 70). The court further noted that although the People had acquired the Iqbal diary while the Grand Jury was still sitting, they had never sought to introduce it.

It would appear that the circumstances of this case present the archetype of a criminal offense for which extraterritorial jurisdiction is designed. If New York County is not the appropriate forum in which to prosecute a defendant for concealing evidence from a New York County Grand Jury, wherever the tampering may have occurred, then what forum is appropriate? Unlike the authority relied upon by Supreme Court, the circumstances of this case do not afford the simple expedient of prosecuting defendant for the offense in an alternative county.

It should be emphasized that the issue to be decided upon this appeal is quite narrow and is limited to the jurisdictional basis for prosecution in the State. As this Court noted in *People v Nieves* (205 AD2d 173, 180, *affd* 88 NY2d 618), it is the prerogative of the Legislature "to decide what quantum of criminal conduct in New York will suffice to support the exercise of criminal law jurisdiction" (citing *People v Werblow*, 241 NY 55, 61). In affirming, the Court of Appeals stated that, in enacting CPL 20.20, the Legislature "codified the principle that 'for the State to have criminal jurisdiction, either the alleged conduct or some consequence of it must have occurred within the State' " (*People v Nieves*, 88 NY2d, *supra*, at 624, quoting *People v McLaughlin*, 80 NY2d 466, 471). The question before the Court is therefore limited to consideration of whether the concealment of evidence from the Grand Jury is a sufficient "consequence" to support the exercise of criminal jurisdiction over defendant.

The sufficiency of the indictment is not at issue. This is an appeal by the People, in which review is limited to errors adverse to the appellant (CPL 470.15; *People v Karp*, 76 NY2d 1006, 1008-1009; *People v Goodfriend*, 64 NY2d 695, 697-698). Defendant, however, devotes a substantial portion of his brief to what the People should be required to demonstrate in order to prosecute him in this forum. It is therefore appropriate to note that a Grand Jury indictment is sufficient, as a matter of law, if "the evidence viewed in the light most favorable to the People, if unexplained and uncontradicted, would warrant conviction by a petit jury" (*People v Jennings*, 69 NY2d 103, 114; *see also, People v Gordon*, 88 NY2d 92, 96).

As relevant to this case, CPL 20.20 provides that

"a person may be convicted in the criminal courts of this state of an offense defined by the laws of this state * * * when * * *

"2. Even though none of the conduct constituting such offense may have occurred within this state * * *

"(b) The statute defining the offense is designed to prevent the occurrence of a particular effect in this state and the conduct constituting the offense committed was performed with intent that it would have such effect herein".

CPL 20.10 (4) provides: "When conduct constituting an offense produces consequences which, though not necessarily amounting to a result or element of such offense, have a materially harmful impact upon the governmental processes or community welfare of a particular jurisdiction * * * such conduct and offense have a 'particular effect' upon such jurisdiction." As will be seen, it is the construction to be given to "particular effect" that is the source of controversy in this case.

With respect to the underlying offense, Penal Law § 215.40 provides that "[a] person is guilty of tampering with physical evidence when * * * 2. Believing that certain physical evidence is about to be produced or used in an official proceeding or a prospective official proceeding, and intending to prevent such production or use, he suppresses it by any act of concealment, alteration or destruction, or by employing force, intimidation or deception against any person." For purposes of the statute, "physical evidence" is defined as "any article, object, document, record or other thing of physical substance which is or is about to be produced or used as evidence in an official proceeding" (Penal Law § 215.35 [1]).

While defendant contends that his intent was simply to keep the Iqbal diary from coming into the possession of the liquida-

tor, the documentary evidence (much of it composed by defendant himself) clearly reflects his belief that Touche Ross would turn over the diary to prosecuting authorities, in accordance with the negotiated plea agreement. The evidence of record indicates that defendant caused the computer disks containing Zafar Iqbal's diary to be erased and, over the course of several years, concealed the existence of copies of the diary in order to prevent its falling into "the wrong hands", specifically, those of "the US prosecuting authorities". As Supreme Court found, "there was ample evidence presented from which the grand jury was able to conclude that defendant possessed the requisite criminal intent."

In subjecting defendant to prosecution in this State, the People rely on "the protective theory of jurisdiction, which is premised on the postulate that the jurisdiction of the State, or one of its counties, may be exercised over conduct outside its geographical borders where such conduct was intended to have a deleterious effect within its territory" (*People v Fea*, 47 NY2d 76, *supra*). Defendant argues that the People have failed to establish his intent to bring about a "particular effect" within New York State (CPL 20.20 [2] [b]) because they have not identified a "materially harmful impact" within the State (CPL 20.10 [4]). The gravamen of defendant's position is that the diary was simply not material to the Grand Jury's investigation, as demonstrated by the People's failure to mark and introduce it into evidence before that body when it was finally obtained. Because concealing this evidence from the Grand Jury produced no "deleterious effect", defendant concludes that the extraterritorial act over which jurisdiction is asserted failed to produce the required "particular effect" within this State to confer criminal jurisdiction (CPL 20.20 [2] [b]). Perversely, it is defendant's contention that criminal jurisdiction is lacking precisely because he was successful in concealing an item of evidence from the Grand Jury and, therefore, any adverse effect the suppression of evidence might have had on its investigation is nothing more than speculation on the part of the prosecution. The People respond, without citation of authority or further elaboration, that "tampering with evidence with intent to keep that evidence from a specific Grand Jury investigation constitutes material harm to the Grand Jury investigation and hence to the governmental processes of the County."

The statute defining the underlying offense does not require a particular effect within the State to support conviction; it

requires only that the offending conduct be undertaken with the *intent* that it cause such an effect—prevention of the production of evidence in connection with an official proceeding (Penal Law § 215.40 [2]). Unlike a "result offense" (CPL 20.20 ▮ [a]), the successful concealment of evidence from the Grand Jury is not sufficient to confer criminal jurisdiction over this matter because this particular consequence is not an element of the offense of tampering with physical evidence (CPL 20.10 ▮; *cf.*, *People v Nieves, supra* [death occurring in New York confers jurisdiction to prosecute defendant for felony murder resulting from robbery committed in Connecticut]).

Because Supreme Court placed so much emphasis on the result as a prerequisite to jurisdiction, it effectively conducted an analysis of the case under CPL 20.20 (2) (a). The record reflects that the Grand Jury began its investigation of the BCCI matter in January 1991 and continued in existence until May 2, 1994. The District Attorney's office did not receive the Iqbal diary until April 25, 1994, when it was turned over to them in Abu Dhabi. By that time, a settlement had already been reached, including the agreement that no criminal or civil proceedings would be pursued against the majority shareholders. Thus, by the time the diary was received, its utility as an aid in the examination of witnesses or as a source of leads to other evidence had been obviated, and defendant's purpose in concealing the evidence had been accomplished. Yet, because actual withholding of evidence is not an element of tampering with physical evidence, success of the criminal enterprise is not a sufficient basis upon which to sustain criminal jurisdiction (CPL 20.10 [3]; 20.20 [2] [a]). In so reasoning, Supreme Court essentially required the People to demonstrate the occurrence of a "result" when the underlying offense is not a "result offense" (CPL 20.20 [2] [a]).

The confusion seems to have arisen because the court's construction of the "materially harmful impact" required to comprise a "particular effect", as defined in CPL 20.10 (4), is closer to the "result" defined in CPL 20.10 (3) than to the "deleterious effect" contemplated by *People v Fea* (47 NY2d, *supra*, at 76). Even on appeal, the parties portray the "injured forum" theory of jurisdiction *(supra,* at 77) provided by CPL 20.20 (2) (b) and 20.10 (4) in isolation, rather than as an alternative to the "result offense" basis afforded by CPL 20.20 (2) (a) and 20.10 (3). The juxtaposition is important in deciding what is meant by a "materially harmful impact upon the governmental processes" of this State for the purpose of conferring criminal jurisdiction.

CPL 20.20 (2) (b) applies to any offense producing consequences in this State that do not "necessarily amount[ ] to a result or element of such offense" (CPL 20.10 [4]), as those terms are defined in CPL 20.10 (3). As relevant to the facts of this matter, conviction under Penal Law § 215.40 (2) requires only the *belief* that an item of evidence "is about to be * * * used in an official proceeding" and the *intent* "to prevent such production or use * * * by any act of concealment, alteration or destruction". Nothing in the statute suggests that conviction for tampering with physical evidence is to be thwarted because, for instance, evidence is obtained by other means despite the tampering or because the evidence is not ultimately used at trial.

To require the People to demonstrate not only the successful concealment of evidence but also the particular manner in which prosecution was hindered, as defendant urges, would be to engraft an additional element onto the crime, as the Legislature has defined it. Furthermore, adoption of defendant's peculiar construction of the jurisdictional prerequisite would require this Court to regard the very conduct prohibited by Penal Law § 215.40 (2) as immaterial to the governmental processes of this State. A Grand Jury investigation is unquestionably a governmental process. By enacting Penal Law § 215.40, the Legislature has declared that the destruction of evidence with intent to conceal it from a Grand Jury constitutes a materially harmful impact on that process. A fortiori, the actual concealment of evidence from a Grand Jury must also be regarded as producing "a perceptible detrimental impact upon the governmental integrity" of New York County (*People v Fea, supra*, at 77).

The statutory basis for the State's exercise of criminal jurisdiction is predicated on the *intent* to bring about some consequence within its territory, not on the realization of that intent. CPL 20.20 (2) (b) confers jurisdiction where "[t]he statute defining the offense is *designed to prevent* the occurrence of a particular effect in this state and the conduct constituting the offense committed was performed *with intent* that it would have such effect herein" (emphasis added). By way of example, in construing the analogous (though not identical) venue provision of CPL 20.40 (2) (a), the Court of Appeals presented the hypothetical case of a person who attempts to cause flooding in Westchester County by blowing up a dam, located nearby in Putnam County. The Court concluded that "either Westchester or Putnam could prosecute the conduct. If the dam were

destroyed, Westchester County's jurisdiction would lie as it would be an injured forum. However, if for some reason the charge did not ignite, Westchester could assert its protective jurisdiction over the transaction, for that theory looks to the intent of the actor rather than the consequences of his act" (*People v Fea, supra*, at 77).

As this example clearly demonstrates, it is not the success of the extraterritorial conduct that confers jurisdiction on the locality, but merely the intent that the conduct achieve a criminal purpose within its borders. Suppression of the Iqbal diary by defendant produced "a materially harmful impact upon the governmental processes" of New York County (CPL 20.10 [4]), that being the precise deleterious effect the tampering statute was designed to prevent (Penal Law § 215.40 [2]; CPL 20.20 [2] [b]; *People v Fea, supra*, at 76).

Accordingly, the order of the Supreme Court, New York County (Felice Shea, J.), entered May 29, 1996, which granted defendant's motion to dismiss indictment number 2778/95, charging him with one count of conspiracy in the fifth degree and two counts of tampering with physical evidence, should be reversed, to the extent appealed from, as limited by the briefs, on the law, counts one and three of the indictment reinstated, and the matter remanded to Supreme Court for further proceedings.

MILONAS, J. P., ROSENBERGER, WALLACH and NARDELLI, JJ., concur.

Order, Supreme Court, New York County, entered May 29, 1996, reversed, to the extent appealed from, as limited by the briefs, on the law, counts one and three of the indictment reinstated, and the matter remanded to Supreme Court for further proceedings.